ASA T. BARRON *v.* RUFUS BARRON, AZUBA SESSIONS, CHESTER BAXTER AND ISAAC PARKHURST.

[IN CHANCERY.]

*Trust interest. Husband and Wife—her rights as against the Husband, his creditors and assignees.*

The grantee, in a deed, which is absolute in its terms and contains no recital of a trust interest, is as much chargeable as trustee by the acknowledgement of the trust in an answer to a bill in chancery brought against him, as though the deed contained an express declaration of the trust.

Where one buys land in the name of another, and pays the consideration money, the land will generally be held by the grantee in trust for the person, who so pays the consideration.

The property of a married woman, whether acquired by gift, devise, or inheritance, before or during coverture, is regarded, in equity, as the property of the wife, and not of the husband, for the purpose of securing to her a provision for her support; and if that right has not been expressly and formally waived or forfeited by misconduct, it will be protected in equity against the husband in any proceedings, which may be adopted at law, or otherwise, for the purpose of reducing it to his possession, and will be equally protected against his assignees, or creditors.

The amount embraced within this equity of the wife, rests in the discretion of the court.

Where money, to which a married woman was entitled by inheritance from the estate of her father, was in the hands of the administrator at the time of the marriage, and it was agreed between the husband and wife and a third person, that a farm should be purchased, and paid for from such fund, and the deed thereof taken by such third person, to hold in trust for the wife, and this agreement was made and carried into execution, for the purpose of preserving the property, as the separate estate of the wife, and the price of the farm was in part paid by the administrator personally, from money in his hands, and in part paid by money which was delivered to the husband by the administrator, and received by the husband, for the express purpose of being applied towards the purchase of the farm, under the previous arrangement above mentioned; *it was held*, that a court of equity would protect the whole, as the property of the wife, and that she was to be regarded as the sole *cestui que trust* under the deed.

The mere receiving, by the husband, of the property of the wife, will not be such a reducing of it to his possession, as will affect the wife's right of survivorship, or equity to a settlement, unless it be received by the husband solely in the exercise of his *marital* rights, and for the purpose of its appropriation to his own use.

---

Rarron *v.* Barron et al.

---

Courts of equity for many purposes, treat husband and wife as distinct persons; capable of contracting with each other, and of having separate estates, debts, and interests, and, as a general rule, whenever a contract would be good at law, when made with trustees for the wife, that contract will be sustained in equity, when made with each other, without the intervention of trustees.

A *post nuptial* agreement between husband and wife, without the intervention of trustees, by which the wife renounces all further claim upon the husband for his services, or support for herself and children, and agrees, that she will contract no debts on his account, and the husband all claim for her services, or support, will be sustained in equity, so far as it has reference to the property of the wife, not only against the husband and his heirs; but against all others claiming under him, who, at least, were not creditors at the time' the agreement was made.

APPEAL from the court of chancery. The orator alledges in his bill, that Rufus Barron on the 20th of October, 1846, was possessed of a large sum of money, to wit, $1100, and that on that day, he with one Azuba Sessions contracted with one Jedediah Kilburn, for a farm for the sum of $1800 ; that of this sum, Rufus Barron agreed to pay, and did pay $1100.

That at the time of said purchase, it was fraudulently agreed upon between said Rufus and Azuba, that she should take the deed directly to herself, and that no mention should be made in said deed of any interest that said Rufus had in and to the same, by virtue of said payment of $1100, as aforesaid.

That in pursuance of said fraudulent agreement, said conveyance was made directly to said Azuba, and no mention was made whatever in said deed, of any interest that said Rufus had in and to the same. That said Rufus did pay $1100, and has an immediate interest in the land in the proportion of $1100 to $1800.

That on or about the 28th day of December, 1846, said Rufus became and was indebted to the orator in a large sum, to wit, $817, in two notes signed by the said Rufus.

That orator commenced a suit on the same, to the May term of the Windsor county court, 1847, that real estate was attached, that orator obtained judgment for $844,15 damages, and $8,98 costs, that execution issued June 14th, 1847, and that on the 25th day of October, 1847, levied on eleven eighteenths of said farm, that said farm was appraised at $1400, exclusive of $145, allowed as railroad damages.

That debtor's interest $855,55, exclusive of said $145, is suffi-

cient to satisfy said execution except the sum of $26,51. That Chester Baxter and Isaac Parkhurst claim to have some interest in the premises, &c.

Prayer. That defendants pay said execution, and in default thereof, that the levy of said execution be established, and that defendants convey the premises levied upon &c.

The bill, as to the defendant, Rufus Barron, was taken as confessed.

The defendant, Azuba Sessions, in her answer, denies that said Rufus was possessed of $1100, on the 20th day of October, 1846, and denies the facts stated and the whole equity of the orator's bill, and says, that on the 20th day of October, 1841, she, on her own account, purchased for $1800, the said farm, and gave her notes, which have since been paid. That all that said Rufus had to do with purchasing said farm, was at her request, to look up a farm such as she wanted, ascertain the price, and communicate to her. That the deed was taken in her name, because she alone purchased; that said Rufus and her daughter Melinda, were married September 6th, 1841, with the previous agreement, and as a consideration that her property should be secured to her separate use, and not subject to said Rufus' control. That her property, $1100, left her by her father, who died April 11th, 1840, was at the time of her marriage with said Rufus, in the hands of A. C. Perkins as administrator, and by him with her consent, was paid on the farm notes. That the residue of the notes were paid by said defendant; that no part of the daughter's portion was ever in the hands of said Rufus, only by investment in the farm.

That at the time of the purchase of said farm, it was understood and agreed that in fulfilment of the agreement before marriage, the administrator should invest her portion in said farm, and defendant to pay the residue, and take deed to herself and hold in trust for Melinda, that she permitted said Rufus to occupy, use and control said farm, and receive and apply the avails, until September 16th, 1844, when for mismanagement and abandonment, she resumed the control.

Says she has been informed, and supposes it may be true, that the orator held the notes, but without consideration, and with the sole purpose and intent to enable an attachment, and to commence this proceeding with the corrupt understanding and intent, if ora-

tor should hold any part of the farm or filch any money, he and said Rufus would share the same. Admits suit, judgment, levy of execution as set forth. Says, that in December 1846, said Rufus was utterly poor, that if any money was passed on the giving of the notes, it was handed back, that said judgment, execution, and notes were fictitious and fraudulent, got up to cheat and defraud this defendant.

Says that Rufus was asked to sign one of the notes given for the farm, for $650, but refused, and A. C. Perkins signed with her.

Admits that since attachment, she has conveyed to Baxter, and informed him of the attachment.

The defendants, Chester Baxter and Isaac Parkhurst, in their answers, admit that they are grantees and purchasers of the premises by conveyance from defendant, Azuba Sessions to said Baxter, and from said Baxter to said Parkhurst, and that at the time of the purchase and conveyance, they each had notice of the orator's attachment.

The answers were traversed and testimony taken; the testimony of Jedediah Kilburn taken and filed, tended to prove, that he was the owner of the farm, and that in the Fall of 1841, he contracted to sell to Rufus Barron said farm, for $1800. And that said Rufus said he could not stop to make the writings at that time, and it was agreed to give forfeiture notes of one hundred and fifty dollars, that witness signed one note for that sum, and the said Rufus another note for same sum, and that both notes were put into the hands of John S. Marcy, Esq., of Royalton, and that if either party should fail to fulfil his agreement, he was to forfeit his note so given.

That the deed was made to Azuba Sessions, that witness did not know how it came to be so made, but that said Rufus said, when he came to see about making the writing, that said deed would not be made to him. That said Rufus paid the three first notes, amounting to $950. That said Rufus lived upon the farm, and carried it on from sometime in November, 1841, until the Spring of 1846, and his wife and said Azuba lived there with him. That said Rufus was industrious and carried on said farm as well as other people manage their farms, that said Rufus provided well for his family, and conducted well towards them, as far as witness

knew. That Mrs. Azuba Sessions, Rufus Barron and A. C. Perkins were present at the office of John S. Marcy, when said writings were made, and that said Marcy made the writings.

That said Azuba signed all the notes for the farm, the first note for $650; A. C. Perkins signed with her, and the rest of the notes were secured by mortgage on the farm. That witness required more security than the mortgage, and said Azuba procured said Perkins to sign with her. That said Perkins came with said Azuba, that he looked over papers, and if he acted for any one, suppose he acted for her, he did look over the farm before the writings were made. That Mrs. Sessions at one time sent money by witness to pay note that had passed into the hands of one Barrett, but not enough to pay note, and witness carried receipt back to her.

The testimony of Mrs. Phidella Kilburn, wife of said Jedediah, was taken by orator, and filed and tended to prove, that said Azuba, in the fall and winter of 1841 and 1842, said upon witness asking her why she took the deed instead of said Rufus, that it was because if said Rufus should be taken away, his children would hold the property, he having two children by a former wife.— That said Rufus was married to his second wife, Melinda Sessions, daughter of said Azuba, about the first of September, 1841.

The testimony of Lydia Burgess was taken and filed, and tended to prove, that she lived in 1843, in the house with said Rufus and wife and said Azuba, and that in the month of August, 1843, the said Azuba, upon the occasion of said Rufus carrying away some hay, said that said Rufus managed the place, just as though he owned the whole of it, that he owned but a small share, between two and three hundred dollars; that Melinda's portion, or a part of her portion, was put into the farm, and she, the said Azuba, made up the rest; that said Rufus was an industrious man and provided well for his family.

The testimony of Theophilus Burgess was taken and filed, and tended to prove, that said Rufus managed the farm as well as most men manage their farms; that he lived about six months in the house with said Rufus and wife and said Azuba, thinks that he paid part of the rent to said Azuba.

The testimony of Oliver Curtis was taken and filed, and tended to prove, that the said Azuba sent for him to assist her in making a settlement with the said Rufus, about four years ago, and that

at that time, said Azuba claimed some $700 in the farm, and that
the use of that, with what she did, ought to support her; that she
at that time, said that they owned the rest, said Rufus and wife be-
ing present; that said Rufus had made some improvements on the
farm, that he put down an aqueduct, and made 30 or 40 rods of
fence with cedar posts on the side of the road.  That some two
years ago, the said Rufus offered to purchase said Azuba's inter-
est in said farm, and at that time had some $750 in money.  That
the said Rufus carried on the farm under an agreement, that he
should have the use of the property and support the family.

Edward P. Nevans' testimony taken and filed, tended to prove,
that he was a merchant in Royalton; that said Rufus and family
traded at his store, and said Rufus settled and paid accounts;—
cannot say as the said Azuba ever got goods and had them charg-
ed to said Rufus.

The testimony of Enos R. Jennings was taken and filed, and
tended to prove, that he served the writ in suit, Asa T. Barron
against said Rufus, and that on that occasion, said Azuba told wit-
ness that she wanted to sell her farm, and gave as a reason, that
she wanted to let said Rufus have what he put in for the farm,
for his two children, and that she wanted said Rufus' children by
his last wife to have the rest; thinks that she said the interest of
the said Rufus in the farm was about $300, and that her interest
was $700.

The testimony of Theophilus Cushing was taken and filed, and
tended to prove, that said Rufus was a man of industrious habits,
and in 1840, reputed to be worth some $400 or $500.

The testimony of Dustin Bates taken and filed, tended to prove,
that said Rufus, in 1841, and 1842, was reputed to be worth some
$500 or $600; that the witness borrowed $200 of said Rufus, in
1840, that he paid it in part in the fall of 1841, and the remain-
der in the Spring of 1842; that said Rufus called for it, saying
that he wanted it to pay for a farm he had been purchasing.

Daniel Taft's testimony taken and filed, tended to prove, that
said Rufus, in 1841, and 1842, was reputed to be worth from $300
to $600.

The defendants took and filed the testimony of Lyman Benson,
which tended to prove, that he was, about four years ago, at the
house of said Rufus, to assist the said Azuba in making a settle-

Barron *v.* Barron et al.

ment with said Rufus, that said Oliver Curtis was also present, and that upon no other occasion were they together for that purpose, that said Rufus at that time did not claim or represent that he had paid anything towards the farm, of his own property, and did not represent that he had any interest in the farm, only by his wife, that said Azuba, at that time, said her interest in the farm was $700 or $800, and that the farm was all paid for with her money and her daughter's. That a settlement was made and put into writing, and signed by said Rufus Barron and Melinda S. Barron, wife of the said Rufus, and daughter of the said Azuba. The said writing was as follows, to wit :—

"This agreement, made between Rufus Barron of Royalton, in "the county of Windsor and State of Vermont, on the one part, "and Melinda Barron, of said Royalton on the other part, she be- "ing his wife. Witnesseth :—That the said Rufus Barron, in con- "sequence of serious difficulties existing between him and the said "Melinda, agrees to leave her, and claim no more services or sup- "port from her whatever, and by her request give up to her the "care and support of her son, that she now has, and that of anoth- "er child, if she should have one, provided they are suitably taken "care of and not abused. But if it should appear that they are "neglected and abused, he the said Rufus Barron claims the right "to take the said children to his own care and support.

"And the said Melinda Barron agrees in consequence of serious "difficulties existing between her and the said Rufus Barron, her "husband, to leave him and claim no more services or support "from him for herself or children, and she will not at any time "contract any debts on his account whatever. In witness of this "our agreement, we hereunto interchangeably set our hands and "seals, this 14th day of March, A. D., 1844.

"Attest, Lyman Benson."

"RUFUS BARRON." (L. S.)

"MELINDA BARRON." (L. S.)

That at the time of making said writing, the said Rufus did not claim any thing as paid in towards the farm, of his own money, but claimed something for betterments, on account of bringing cedar posts, and making fence, and bringing water ; that he claimed in all for betterments, or for farm being in better condition, something over $80. That it was at that time figured up and Mr. A.

C. Perkins, who was present, became responsible for the amount, to him ; that there was included in this amount, some hay and other articles.   That Austin Robinson carried on the farm in 1844, under a written lease from the said Azuba, and in 1846, Horatio Spaulding carried on the farm under a written lease from said Azuba.   The testimony of Alvah C. Perkins, taken and filed, tended to prove that said Azuba purchased a farm in Royalton, the 20th day of October, 1841, of Jedediah Kilburn, that Rufus Barron was present and looked over the farm with witness, and that said Rufus went to the village when the writings were made ; that witness went to see that writings were made out agreeably to trade, by request of Mrs. Azuba Sessions; that price of said farm was $1800, and $1150 of that sum, secured by mortgage on the farm, and that witness signed note with the said Azuba, for $650, payable to said Kilburn, and due April 1st, 1842, and said Azuba signed the other notes.   That witness asked the said Rufus to sign the said note for $650, with said Azuba, and said Rufus declined, saying that he had no interest there, and that witness had the property to pay for the farm, and ought to sign said note.   That said Rufus and Melinda were married in September, 1841 ; that previous to her marriage, her name was Melinda Sessions, a daughter of Darius and Azuba Sessions.   That it was the talk of both said Rufus and Melinda, previous to their marriage, that said Melinda's property should not go into the possession of said Rufus on their marriage, but should be kept for her use, and none of it go into his hands, and be under his control.   That said Azuba took the deed of said farm with the consent and knowledge of said Rufus, the object being to secure it for the benefit and use of the said Melinda, and that it was a little short of $1100 that was paid towards said farm, of said Melinda's property.   That at the time of the purchase of said farm, said Azuba and said Melinda's property was in the hands of witness, amounting to about $2000, in notes, and in addition to which there was about $200, in personal property.   That at the time of the marriage of said Rufus and Melinda, the said Melinda's property was in the hands of witness, principally in notes ; thinks the amount was between $1600 and $1700, but had not settled with the probate court.   That witness was administrator of the estate of said Darius Sessions, who died in April, 1840, and thinks administration was closed in October,

1842; and that witness paid over, of the money belonging to the estate of said Darius, the full amount for said farm, including principal and interest.

The court of chancery, at the August adjourned term, 1851, COLLAMER, chancellor, ordered and decreed that the orator's bill be dismissed, with costs.

From which order and decree the orator appealed.

*Washburn & Marsh* for orator.

The farm in question was purchased for $1800; and the plaintiff insists that his debtor, Rufus Barron, has an interest therein of at least $300, for money which belonged to him previous to his marriage, which a court of equity will enable the plaintiff to reach. *Waterman* v. *Cochran et al.*, 12 Vt. 699.

Mrs. Sessions admitted to *Mrs. Burgess*, that Rufus had between $200 and $300 in the farm. Rufus claimed, in presence of *Oliver Curtis*, that he had paid in between $300 and $400; and this was not denied by Mrs. Sessions. To *Jennings*, Mrs. Sessions said, she wanted to let Rufus have what he put in there, for his two first children, which she said was $300.

But the plaintiff also claims, that he is entitled to hold the farm for the *residue* of his debt.

To this the defendants reply, that the plaintiff cannot recover, by reason of the wife's " *equity*," as it is termed.

That the wife's " *equity* " is never enforced, (in the absence of cruel treatment, or similar cause,) except when the husband or his assignee is attempting to reduce to possession, that which is the *property of the wife*, and which cannot be obtained without resort to a court of chancery. If the husband have once reduced the property into possession, it is his absolutely, and equity will not *restrain* or *limit* his use of it. Story's Eq. 631, 633, 634, 635. *Jewson* v. *Maulson*, 2 Atk. 417. *Vanduzee* v. *Vanduzee*, 6 Paige 370, 371. 1 Mad. Ch. 387–8. 2 Kent 141. *Murray* v. *Ld. Elibank*, 10 Ves. 90. *Howard* v. *Moffatt*, 2 Johns. Ch. R. 206.

But in this case there is no attempt to reduce to the *husband's* possession, the property of the *wife*.

The parol agreement before marriage, is simply nugatory. It is *void*, both *at law* and in *equity*. Rev. St. 316. 1 Mad. Ch. 297–8. *Montacute* v. *Maxwell*, 1 P. Wms. 618. Newland on

Cont. 191–3. *Reade* v. *Livingston*, 3 Johns. Ch. R. 481. *Dundas* v. *Dutens*, 1 Ves. 199.

And in asserting the wife's "*equity*," such anti-nuptial parol agreement does not vary the rights of the parties, for her equity is recognized and asserted, precisely to the same extent without, as with it; this case should therefore be considered precisely as though no such previous agreement existed. The *money*, which came into the hands of the husband from his wife's estate, became, by the operation of positive law, by the mere act of his receiving it, his absolute property. *Udall* v. *Kenney*, 3 Conn. 599. *Legg* v. *Legg*, 8 Mass. 101. 1 Madd. Ch. 381–2. *Ward* v. *Morrill*, 1 D. Ch. 322.

And the *trust* which was created in Mrs. Sessions, by her taking to herself the deed of land so paid for, was a trust in favor of the husband, and not of the wife.

The orator therefore, is not seeking, as assignee of the husband, to reduce to possession the *property of the wife*, but to obtain satisfaction for his debt from what is absolutely the property of the husband.

And the defendants can derive no aid from the *post nuptial agreement* of March 14th, 1844, for that recites no previous agreement, is made without the intervention of trustees, and is utterly void. 1 Story Eq. 653 – 4.

But if any effect is to be given to the anti-nuptial agreement as connected with the acts of the parties after marriage, it should merely be to effectuate the evident intent of the parties, by treating the property of the wife as *real estate*. The object of the parties was, as stated by the wife, to prevent the property being expended, and to prevent its being inherited by the husband's children by a former marriage, and for this, they chose to invest the money in *land*, on which they might all live together. The most, then, which the wife can claim, is that the property should be treated as though it had been *land*, at the time of the marriage.

If the property is so considered, then, by positive law, the usufruct of the real estate became, by operation of the marriage, absolutely the property of the husband; and the orator, whose levy is sufficient to embrace this, is seeking to obtain, to this extent, the property, not of the *wife* but of the *husband*. *Vanduzee* v. *Vanduzee*, 6 Paige 366, 370.

This right of the husband is analogous to his interest in the wife's trust of a term, or her legal estate of a term. It is absolutely the property of the husband, and not subject to the wife's equity, and his assignment of it is valid. *Turner's Case,* 1 Vern. 7. *Tudor* v. *Samyne,* 2 Vern. 270. *Jewson* v. *Maulson,* 2 Atk. 421. Newland on Cont. 124. 1 Mad. Ch. 387.

But this is not a case where chancery will enforce the wife's equity against the husband, or his creditor. The wife *lives separate* from her husband *voluntarily,* without pretense of abuse or ill usage on his part, and when all the evidence shows him to be an industrious, prudent man, and that he has always provided well for his family. To grant a separate maintainance to the wife, would perpetuate this condition of things, contrary to the established policy of the court of chancery. 2 Story's Eq. 651. *Cooper* v. *Gleason,* 3 Johns. Ch. R. 521. *Rogers* v. *Rogers.* 4 Paige 516. *Bullock* v. *Menzies,* 4 Ves. 798. *Duncan* v. *Duncan,* 19 Ves 394.

But the wife's estate was between $1600 and $1700. There is no pretense that her husband has ever received to his own use, more than a very small portion of it. If the wife is entitled, under the circumstances, to any provision, she is not, by the established usage of this court, entitled to the *whole.* 1 Daniel's Ch. Pr. 140. *Burdon* v. *Dean,* 2 Ves. 608. *Wright* v. *Morley,* 11 Ves. 20, 21.

And the case should be referred to a master, to ascertain the amount of the entire fund, the amount received by th · husband to his own personal use, and to report his opinion as to what should be allowed to the wife.

*Tracy, Converse & Barrett* for defendants.

The bill is brought on the ground of an alledged fraud in the investment of Rufus Barron's money in the farm, and taking the deed to the name of Mrs. Sessions.

The bill must be sustained on that ground, if sustained at all.

Objections to sustaining the bill on that ground.

1. If Rufus Barron was party to the alledged fraud, he could not get relieved as against Mrs. Sessions, either in equity or law. 1 Story's Eq. 364.

Unless the orator was affected by the fraud, he can stand only on the same ground as Rufus, and can claim no relief.

2. The orator is not affected by the alledged fraud, for three

reasons. First. He was not a creditor *at the time of the purchase of the farm*, and could not have been in contemplation so as to be such in future. There is no legal implication of fraud only in case of existing present creditors. 1 Story's Eq. 347–8, 354, and note 2. 8 Wheat. U. S. Rep. 229. 5 Cond. Rep. 419. Second. No fraud was in fact intended or committed. The answer denies it, and the whole transaction as shown by the proof, repels any such idea. Third. Asa T. Barron *never was a creditor*. The claim of the answer is sustained by the legitimate result and force of the proof, viz., that Rufus was not indebted as alledged, but the proceeding was undertaken, to wrest from Mrs. Session's hands, her daughter's money invested in the farm. The answer alledges, and the proof leads to the result, that in 1846 Rufus was poor and had no credit, on which to base an indebtedness then accruing of $800.

3. But on the ground of the right of a judgment creditor to the aid of a court of chancery, to enable him to reach property of his debtor held in trust, the orator cannot prevail in this suit. First. We submit, there is no resulting trust in favor of Rufus Barron. None of *his* money was paid at the time of the purchase. A subsequent advance of money after the purchase is completed, cannot by relation, attach a trust to the original purchase. *Botsford* v. *Burn*, 2 J. C. 405, 409. *Pinney* v. *Fellows*, 15 Vt. 525.

This purchase was completed at the time the notes and mortgage were executed and delivered. The money claimed to have been paid by Rufus could only be treated as a subsequent advance giving no interest in the real estate by way of trust.

The evidence rebuts any presumption of a resulting trust; even if it were true, that Rufus Barron paid on the notes $200 or $300, of his own money. 2 Story's Eq. 445.

The entire understanding was, that the purchase was made and the title was taken to Mrs. Sessions, for the benefit alone, of Mrs. Sessions and Melinda.

Such was Rufus Barron's understanding and agreement, and any other claim or pretense now, is a fraud on Mrs. Sessions and Melinda.

Again, Rufus Barron is not asserting any trust. There is no declaration or creation of trust in his favor. It is left to arise by implication of law, from the *fact of payment of purchase money*.

Until the person paying, sets up and claims a trust, the implication is, a gift of the money or a voluntary conveyance; which being without fraud is valid against both the donor and his subsequent creditors.

In order to establish a resulting trust, it must be shown by clear proof that the money of Rufus has gone into the purchase of the farm. This does not appear from the proof as it now stands. *Boyd* v. *McLane*, 1 Johns. C. R. 590. *Botsford* v. *Burr*, 2 Johns. R. 405.

But a full answer to the pretense of claim by way of resulting trust is, the bill is not framed in any such view and cannot be used for any such purpose.

On the main subject we submit two views, embracing and disposing of the whole case:

1. If all the money claimed in the bill was Melinda's, then the trust inures to her benefit in entire exclusion of her husband and his creditors. The case of *Pinney* v. *Fellows*, 15 Vt. 525, and *Porter* v. *Bank of Rutland et al.*, 19 Vt. 410, are conclusive, both that the whole money coming from her father's estate was hers as against her husband, and that she is the exclusive *cestui que trust*.

2. If the whole $1100 was in fact the legal property of Rufus before it was invested in the farm, by its investment it became a trust exclusively in favor of the wife, which neither he nor his subsequent creditors can reach.

It was invested under an anti-nuptial agreement, which was executed not only by the marriage, but by the actual investment of the money in trust.

The statute of frauds does not affect the case. This is not a case in which the *wife* is undertaking to enforce an executory anti-nuptial agreement resting in parol *by action brought by her* or *her* representatives. See *Pinney* v. *Fellows*, as to post-nuptial agreement.

The contract was executed. The action is brought by a subsequent fictitious creditor of the husband against the trustee.

The husband could not repudiate the settlement, and reclaim the money as a trust in his favor by a bill against either the trustee or the wife, or both together. *Ward* v. *Morrill et al.*, 1 D. Chip. R. 322. Nor can the creditor any more than the husband.

The creditors can only do it when they have been defrauded by the voluntary conveyance or settlement, and generally subsequent creditors cannot be so defrauded.   Newland on Cont. 384.   7 Pet. R. 393.   1 Story Eq. Ju. § 355, § 361, § 362.   *Sexton* v. *Wheaton,* 5 Cond. Rep. 429.

The proof shows, that the farm was purchased pursuant to a contract embracing also a contract of marriage — securing property to her sole use.   The object is to overhaul and diminish the provision thus made.   2 Story Eq. Ju. 631, close of § 1405.

The opinion of the court was delivered by

ISHAM, J.   The object of this bill in chancery is to perfect the title of the orator to that portion of the premises therein described, which was conveyed by Jedediah Kilburn to Azuba Sessions, and upon which his execution against Rufus Barron was levied.   The bill charges, that the premises were contracted for at the price of $1800, that the deed was executed to Mrs. Sessions for the purpose of keeping the property from the creditors of Rufus Barron, and that a fraudulent agreement to that effect was made between them.   The orator further states, that Rufus Barron was possessed of $1100 in money, and paid that amount towards the purchase, and insists, that to that extent Rufus Barron has an equitable interest in the land, subject to be taken on his execution, and that a legal title to the premises upon which his execution was levied, should be perfected in him by decree of this court.

The bill is taken as confessed by Rufus Barron, but answered by the other defendants.   Mrs. Sessions, in her answer, denies the facts stated, and the whole equity of the orator's bill.   The defendants Baxter and Parkhurst, admit, that they are grantees and purchasers of the premises by regular conveyances from Mrs. Sessions to Baxter and from Baxter to Parkhurst, and that at the time of the conveyances they respectively had notice of the orator's attachment; so that their right and title is held subject to the claim of the orator under his attachment, as it may be perfected at law or in equity.   The recovery of the judgment in favor of the orator *v.* Rufus Barron, the issuing an execution thereon, and the levy of the same on the premises in question, are facts not disputed; and it is equally undeniable, that the orator has laid a proper foundation for sustaining this bill, by exhausting his

remedies at law in seeking satisfaction of his execution. The conveyance from Kilburn to Mrs. Sessions was made October 20, 1841, and was paid for at the time by the notes of Mrs. Sessions, with the understanding, however, that the notes were to be paid by the application of about $1,100 coming to Melinda, the wife of Rufus Barron, from the estate of her father, and which was then in the hands of the administrator; and the balance was to be paid by Mrs. Sessions from her own estate. It is evident, from the testimony in the case, that the deed was executed to Mrs. Sessions by the request of Melinda, and with the consent of Rufus Barron, for the purpose of placing the amount so paid from the distributive share of Melinda in the hands of her mother, as trustee, to preserve the same for her sole use and benefit and as her separate estate, so that in no event it should become the property of her husband, or subject to the inheritance of his children by a former wife. The case is free, therefore, from any question of fraud in fact, arising from the execution of the deed to Mrs. Sessions; for it does not appear, that Rufus Barron was any where indebted at that time, and the claim of the orator accrued several years after this transaction.

Mrs. Sessions admits, however, that her personal interest is only to the extent of about $700, and that she holds the remainder as trustee for her daughter Melinda; and insists that it belongs to Melinda as her separate property, independent of any claim of her husband or his creditors. This answer is conclusive upon her as to the extent of her personal interest in the premises; and though the deed may contain the statement, that its consideration was paid by Mrs. Sessions, and contains no recital of a trust interest, yet, she is as much chargeable as trustee, by the acknowledgment of the trust in her answer, as if the deed contained an express declaration of the trust. 2 Story's Eq. § 1201, and note 2. 2 Atk. 155.

The important inquiry, therefore, in the case is, who is really the cestui que trust under this deed, of that portion of the premises paid for by Melinda's share from the estate of her father? The question is presented free from any embarrassment arising from questions of fact; for we learn from the testimony, that the marriage of Rufus Barron with Melinda took place Sept. 6, 1841, while her father deceased April 11, 1840; so that the distributive

share vested in the wife of Rufus Barron prior to their marriage, and her title thereto, though not reduced to her actual possession, became absolute and unconditional.

We are enabled to obtain an answer to the inquiry, which of these parties is entitled to that trust estate contained in the deed to Azuba Sessions, by ascertaining *to whom belonged the money which was paid for its purchase.* For it is a common principle in equity, " that where one buys land in the name of another and " pays the consideration money, the land will generally be held by " the grantee in trust for the person who so pays the consideration." This, says Justice STORY, "is an established doctrine, and not " open to controversy." 2 Story's Eq. § 1201, and note 2. Such conveyances create a resulting trust, which is not the subject of seizure or sale. But by the levy of an execution upon the premises there is created an equity in behalf of the creditor, which can be reached by the aid of a court of chancery; and this is one of the most important sources of equitable jurisdiction and power. *McDermot* v. *Strong,* 4 Johns. Ch. R. 687. *Scott* v. *Scholey,* 8 East. 467. *Waterman* v. *Cochran et al.,* 12 Vt. 699.

If in this case the money paid for the land was the property of the wife, constituted part of her separate property, and was subject to her sole disposition and use, then it is evident a court of equity should protect it for her benefit. But if by the marriage, or otherwise, that money became the absolute property of Rufus Barron, and as such was vested in real estate, then he has the equitable interest therein; he alone is the *cestui que trust,* and the property is held by the trustee for his benefit. In such case it is the duty of a court of equity to protect the title of this plaintiff under his levy, by decreeing the payment of his execution, or the conveyance of the legal interest in the premises upon which the execution was levied, as prayed for in the bill.

At common law, by the marriage the husband is seized of the freehold, *jure uxoris,* of all lands, of which she was seized of an estate of inheritance, at the time of their marriage. Co. Litt. 351, *a.* And he takes the rents and profits during their joint lives, and, in case of his survivorship, in some cases, during his natural life, as tenant by the courtesy. If she is seized of an estate for her own life, or *per auter vie,* the husband is seized thereof in right of his wife, and is entitled to the rents and profits. To

Barron *v.* Barron et al.

all her chattels real, the husband becomes entitled, with the power to sell and otherwise dispose of the same, as he pleases during his life; and in case of his survivorship they become absolutely his. Of all her personal chattels capable of immediate and actual possession, he becomes likewise the absolute owner. To her *choses in action,* as debts due by bond, note, simple contract, or otherwise, he has a qualified right, rendered absolute by reducing them into possession during coverture; if not so reduced, they pass to the administrator of the wife. 2 Kent's Com. 113.

This right of the husband to the property of the wife is acquired in consideration of the obligation resting upon him by the marriage to pay her debts, as well as to maintain her and her children. But while this right is given to the husband over the property of the wife, no provision at common law is made to secure the performance of the corresponding duties of the husband to the wife,—as having this claim to her property, he is enabled to transfer and dispose of it, or, upon his bankruptcy and insolvency, the property would vest in his assignees for the benefit of his creditors, and his wife, whatever may have been her fortune, may, with her children, be left destitute of the means of subsistence. To remedy this deficiency in the common law, courts of equity, from the earliest period, have exercised their power by giving to the wife a right to a provision out of her own property, and which is termed, *the equity of the wife.* It was formerly considered, that this equity could be protected only where *the husband* was seeking the aid of a court of equity to obtain possession of the wife's property. 1 P. Wms. 460. 2 Story's Eq. § 1414. But since the case of *Lady Elibank* v. *Montolieur,* 5 Ves. 737, the wife is permitted to actively assert her claim in equity, as plaintiff. "The equity is the same, in whatever form or by whomso-"ever presented." 1 Lead. Cas. in Eq. 333.

It was also formerly considered, that this equity was confined to the absolute personal property of the wife. But afterwards it was extended to the rents and profits of real estate, in which she had a life interest. And at the present day this equity has a more extensive application, and is attached to the rents and profits of all her real estate, whether legal or equitable, whether they are of inheritance, or for life, and whether leasehold estates, or a trust term for years. Clancey 445–6. 5 Myl. & Craig 97, 101

to 103, *Sturgis* v. *Champneys*, 4 Hare 1. *Hanson* v. *Keating*, 2 Story's Eq. § 1410. And whatever qualification may be found in the application of this doctrine to different cases, that qualification has no existence, where the husband and wife are living *separate and apart*, without any fault on the part of the wife, nor in case of the *bankruptcy* or *insolvency*, of the husband. 5 Vesey 517, *Lamb* v. *Milnes.* 10 Beav. 324, *Wilkinson* v. *Charlesworth*, and *Massack* v. *Lyster.* In which Lord LANGDALE disapproved of the case *Vaughan* v. *Buck,* 13 Sim. 404.

In relation to her personal property, as well as her *choses in action*, this equity of the wife will equally be protected. It has been, and with some qualifications, is now held, that if her personal property had been actually reduced into possession, and is not a mere right or thing in action, so that a complete legal right is vested in the husband, the wife's equity can no longer be enforced. 1 Eq. Lead. Cas. 351. And that whenever he was pursuing the common *remedies at law* for the purpose of reducing into possession, the personal property of the wife, courts of equity will not interfere, but will ordinarily remain passive. 2 Story's Eq. § 1403. But it is now held, and the cases are not unfrequent, in which the husband has been restrained by injunction from enforcing his legal remedies to obtain the wife's property, or reducing to possession, the wife's choses in action, for the purpose of enforcing her equity to a settlement. 2 Kent 121 and note 6. Clancey on Mar. Wom. 466. 1 Eden 506, *Mason* v. *Masters.* 1 Roper on Hus. and Wife, 271. 2 Sim. 167, *Pierce* v. *Thornby.* 5 Johns. Ch. R. 477, *Kinney* v. *Udall.* 4 Paige, 74, *Van Epps* v. *Van Deusen*, and this is regarded as a salutary rule in case of the *insolvency* of the husband, or separation from his wife without fault on her part. In the case of *Eedes* v. *Eedes*, 11 Sim. 569, it was held, that where a married woman left her husband, and was living separate from him, but not in a state of adultery, she was entitled to a settlement out of a sum in stock, to which her husband had become entitled in her right. If the husband has obtained the possession of the property without suit, and it still remains in his hands, he will, in many cases, be adjudged the trustee of the wife; this was so decided in this State in the case of *Porter* v. *Bank of Rutland*, 19 Vt. 410. 2 Kent 146. Clancey 260. If the property of the wife have been received and appropriated by the husband to his use, other

circumstances must determine, whether the wife has lost her equity. If they were living together, and the property have come into his possession, and so have been appropriated by her consent, it will be presumed a gift to her husband, and her equity will be lost. But if the property have been so appropriated under circumstances showing that it was to be repaid, then she will stand in equity, as the creditor of the husband, and her claim will be enforced against his executors. Thus where a wife advances money from her separate property, to redeem a mortgage on her husband's estate and takes a receipt for the money, she will stand in the place of the mortgagee, and the heir must redeem it from the wife. Reeve's Dom. Rel. 165. And Lord THURLOW ruled, that if a wife mortgaged her separate real estate for her husband's benefit, it will be considered the debt of the husband, and that it should be satisfied out of the assets of the husband's estate. 1 Ves. 186, *Clinton* v. *Hooper;* and Judge REEVES remarks, that wherever it appeared from the evidence, that the wife had claimed, that her husband was debtor, or that he had recognised himself as such by proposing to pay her, she is considered, on the death of the husband, as a creditor. Reeve's Dom. Rel. 165.

This equity of the wife, is also sustained in relation to the distributive share of an estate, to which she is entitled by inheritance, and whether that right became vested in her before or after marriage. The right of the husband to that species of property is purely marital, and which a creditor cannot exercise for the husband, against his will. In New Hampshire, in the case of *Parsons* v. *Parsons*, 9 N. H. 309, it was held, that a distributive share of an intestate estate, to which a *feme covert* is heir, does not vest absolutely in the husband, but he has simply the same qualified right that he has to her other *choses in action*. The same doctrine was sustained in *Wheeler* v. *Moore and Tr.*—PARKER, C. J., uses this emphatic language :—" That a husband has a right to " claim such distributive share to his own use, but that he is not " obliged to exercise that right. If he omit so to do, on his death, " the right will survive to the wife in her own right, and as heir " to the estate, and if he *neglect or refuse* to reduce it to posses- " sion, it is clear, that after his death, neither his heirs, or credit- " ors, could assert any claim to it." And it was held in that case, that such property, until so reduced to possession, was not *at law*

XXIV.        26

subject to an attachment at the suit of the creditors of the husband, or to the process of foreign attachment. 12 N. H. 164, *Marston* v. *Carter.*

In Mass., at law, the decisions are otherwise, and the interest of the husband in his wife's distributive share of an intestate estate is subject to be attached, in the hands of the administrator, by the trustee process, at the suit of a creditor of the husband. This right is there, as it is now in this State, given by express statute, and extends to legacies and other effects in the hands of the administrator. C. 109 § 62 : 20 Pick. 563. *Wheeler* v. *Bowen.* Ibid. 517, *Hayward* v. *Hayward.* But in the last case it was held, that if the husband died without reducing the property into possession, it survived to the wife. And in the case of *Davis* v. *Newton,* 6 Met. 537, on a bill in equity, it was ruled, that whatever may be the rights of the creditors at law, yet at any time before distribution, the court will protect the equity of the wife, and compel them to make suitable provision for her support, and that of her children.

In New York, Chancellor KENT observes :—2 Kent 123, 114, that the leading provisions and principles of the English courts of equity, have been incorporated into the equity jurisprudence of that State, and that legacies and distributive shares accruing to the wife during coverture, stand on the same footing, the husband having simply a qualified interest therein, subject to the equity of the wife. 6 Johns. Ch. 178, *Haviland* v. *Bloom.* 5 Johns. Ch. 198, *Schuyler* v. *Haylee.*

In this State, a similar view has been entertained; and the case of *Short* v. *Sampson and Trustee,* 10 Vt. 446, contains the elements of the doctrine in relation to the equity of the wife, as it is held by the courts of chancery in England and most of the States in this country. In that case it was held, as in New Hampshire, " that the husband has no such interest in money decreed by the " probate court to be paid to the wife by the administrator, as her " distributive share in her ancestor's estate, as could be attached " by the creditors of the husband ;" and the reason assigned is this—" that the right of the husband to this share, even after de- " cree of distribution, is only conditional; no specific money pass- " es by the decree. It is, at most, a mere *chose in action,* and as " such, belongs to the wife, until the husband reduce it to posses-

" sion." And in relation to the equity of the wife, the court say,
" that in chancery, such *choses in action* are treated as the sepa-
" rate property of the wife, and on application will interfere to pre-
" vent the husband from squandering such property, and compel
" him to make suitable provision for the wife, or else appoint a re-
" ceiver for her benefit; and that it would be unreasonable to per-
" mit the creditors of the husband to reach such property." In
this case, there is made a direct application of the doctrine of the
wife's equity to her distributive share in the estate of her ances-
tors, as against the husband and his creditors. In all these cases,
to which we have referred, the property of the wife, whether ac-
quired by gift, devise, or inheritance, before or during coverture,
is regarded as the property of the wife and not of the husband;—
and if that right has not been expressly and formally waived, or
forfeited by misconduct, it will be protected in equity against the
husband in any proceedings, which may be adopted at law, or oth-
erwise, for the purpose of reducing it to his possession. And
will be equally protected against his assignees, or creditors; for
it has been justly observed, that the " equity of the wife is para-
"mount to the interests, powers, and rights of the husband, and
" of all persons dealing with him." 1 Lead. Cas. in Eq., 352;—
and by Lord LANGDALE it was held, that this protection would
be equally extended to the income of the property, in case of the
insolvency of the husband, or their separation. 10 Beau. 324,
*Wilkinson* v. *Charlesworth.*

The amount embraced within this equity of the wife, rests in
the discretion of the court; formerly it was limited to one half.—
In the case of *Davis* v. *Newton,* 6 Met. 544, " it was held by Ch.
" J. SHAW, that the amount depended upon circumstances—as the
" amount of the property belonging to the wife, her age, health,
" and condition, as well as the number, age and condition of her chil-
" dren. In this respect, where the matter comes properly before
" the court, it is competent for the chancellor to obtain the aid of
" a master to inquire into their circumstances, and to report what
" sum would be a suitable provision. But in cases where the pro-
" perty is small, and has been kept entirely distinct from the hus-
" band, and where it is evident, that the exigences of the family
" require it, it would be proper to appropriate the whole of such
" property to the use of the wife and her children;" and also the

interest or income of the property, in case of their separation, or insolvency. 1 Lead. Cas. in Eq., 353. 5 Johns. Ch. R., 464, 478. 6 W. 25. 3 Kelly 193, 205.

The application of these principles, to this case, is not a matter of much difficulty. The money, to which the wife of Rufus Barron was entitled by inheritance from the estate of her father, was in the hands of the administrator at the time of the marriage and purchase of the farm. But little has been paid to her; some was paid to her husband, by her consent. The arrangement, for the purchase of the farm and manner of payment therefor, was a matter of mutual consent and agreement between the husband and wife and trustees, for the purpose of preserving the property as the separate estate of the wife; and the amount paid by the administrator to the holder of the notes given for the farm, was paid in pursuance of that mutual arrangement and agreement; and to that extent, we think it clear, that the money paid was the property of the wife. And it is equally evident, that the same consequences follow in relation to the money handed by the administrator to the husband for the purpose of paying the balance due on those notes from the wife. The facts in relation to the manner in which the money was handed to him by the administrator, are not disputed. When requested by the administrator, he refused to collect the notes belonging to his wife, for the purpose of paying the notes given for the farm, saying that no part of that estate should come into his hands,—but he consented, if the money was collected by the administrator, to carry the money to the holders of the notes, if it would be an accommodation to him.

If this, as has been contended by counsel, can be considered as a reduction of this property into possession by the husband, still as it was immediately applied upon the notes given for the land, in pursuance of their previous arrangement, no court of equity could refuse to protect it, as the property of the wife, the same as if the money had been sent by other hands. But the authorities are clear, that that was not such an act in reducing the property of the wife into the possession of the husband, as can effect the right or interest of the wife at law, or in equity. Other considerations must unite with the fact of actual possession, to affect her right of survivorship, or her equity to a settlement. To produce such results, Chancellor KENT remarks, 2 Kent, 118,—the possession of

the husband must be in his character as husband, obtained in the exercise of his marital rights, and for the purpose of its appropriation to his own use. In the case of *Baker* y. *Hall,* 12 Ves. 497, the wife was residuary legatee; and the husband took possession of the real and personal estate of the testator, as executor; and it was held by the master of the rolls, that, as he took possession in that character, and not as husband, it could not be deemed sufficiently reduced into possession to prevent its survivorship to the wife. In *Wall* v. *Tomlinson,* 16 Ves. 413, a transfer of the wife's stock to the husband, as trustee, was held not to be a reduction into possession, so as to bar the wife's survivorship; for it was made *diverso intuitu.*

The case under consideration, is stronger than those, in behalf of the wife. As the money was handed to the husband by the executor and trustee of the wife, for the specific purpose of its appropriation in payment for the land, and in that character was received by the husband, under his disclaimer of any right thereto. It is difficult to conceive of a case, where the property of the wife has been kept more distinct from the husband, than in this, and for the purpose of securing her maintenance and the support of her children. In the same condition it remained, when paid towards the farm; for there had been no exercise of marital right in claiming it; and when the money was so paid, it was taken from the separate property of the wife, which it is the duty of a court of chancery to protect.

And on the execution of the deed to Mrs. Sessions, in pursuance of their mutual arrangement, the trust estate enured to the wife, from whom the consideration came, she is to be regarded as the sole *cestui que trust* under that deed, to the extent of the purchase money paid from her separate estate. Her interest is purely equitable, and can be obtained only by the aid of a court of equity; and chancery will not permit that property to be taken from its jurisdiction by the husband, or his creditors, until there has been secured the equity of the wife.

This view of that part of the case renders less important the examination of the case in relation to the post-nuptial agreement between Rufus Barron and his wife, yet as the question is directly presented in the case, it is proper to remark, that the agreement evidently would be of no avail at law. At common

law the husband and wife are treated as one person; her legal existence is merged in that of her husband; their contracts, made when single, are avoided by the intermarriage ; when made during coverture, they are of no binding obligation; the husband can neither grant to, or covenant with his wife, for that supposes her to possess a distinct and separate existence. From this principle arises the necessity, at law, of all conveyances, covenants, marriage settlements, and the like, being made through the interposition of trustees. Story's Eq. § 1380. 2 P. Wms. 79. 2 Ves. 190. But courts of equity, for more than a century, have disregarded that rule, and for many purposes treat husband and wife as distinct persons, capable of contracting with each other, and of having separate estates, debts and interests. Story's Eq. § 1368. 2 Johns. Ch. 539. And as a general rule, whenever a contract would be good at law, when made with trustees for the wife, that contract will be sustained in equity, when made with each other without the intervention of trustees. It is upon this principle, that in many cases the husband will be held as trustee of the wife, and the wife entitled to the privileges belonging to a creditor of the husband. Story's Eq. 1373, 1380.

The agreement in this case was made March 14, 1844, nearly three years after their marriage, and in substance, after agreeing to separate, the wife renounces all further claim upon the husband for his services, or support for herself and children, and agrees that she will contract no debts on his account; and the husband renounces all claim for her services, or support. This agreement, if carried into effect, should be enforced so as to fulfil the evident intention of the parties. Without looking at the instrument in any other light than with reference to its effect upon the property of the wife, it was manifestly his intention to renounce all his claim or marital right to her future services, as well as support from her property, leaving the same for her support and that of her children. That an agreement of that character, made directly between husband and wife, and without the intervention of trustees, will be sustained in equity, is clearly sustained by authority. Justice STORY remarks,—2 Story's Eq. § 1372,— "That if the husband should, for good reasons, after marriage, "contract with his wife that she should separately possess and en- "joy property bequeathed to her, the contract would be upheld

"in equity." Chancellor Kent remarks,— 2 Kent 147, 154,—
" That a wife may contract with her husband, even.by parol, after
" marriage, for a transfer of property from him to her,' or to trus-
" tees for her, provided it be for a *bona fide* and valuable consid-
" eration, and she may have that property limited to her separate
" use." 1 P. Wms. 125. 2 Vern. 659. 2 Johns. Ch. 537. 10
Ves. 146. He further remarks, "that gifts by the husband to
"the wife will be supported as her. separate property, if they be
"not prejudicial to creditors, even without the aid of trustees."
In the case of *Herr's appeal*, 6 Law. Rep. 408, it was held in
Penn. by Ch. J. GIBSON, that where the husband was in .the
habit of giving his wife the specie that came to him in the course
of his business, until it amounted to $4500, it became the property
of the wife, as against the heirs at law, and in the nature of a
provision for her; and this gift and contract, made after marriage,
and without the intervention of trustees, was enforced against his
estate. In the case of *Searing* v. *Searing*, 9 Paige 284, the hus-
band permitted the wife, after marriage, to receive the avails of
her property, which she held before marriage, and re-loan the
same on securities in her own name, and afterwards gave her
$2000 which was loaned by her on like security, on her releasing
her right of dower to his farm on its sale. It was held, that this
gift and contract, though made after marriage and without the in-
tervention of trustees, was binding upon the husband and his es-
tate. And though such gifts would not be sustained against cred-
itors, who were such at the time, yet they will be sustained against
the husband and subsequent creditors. 3 Johns. Ch. 490, *Reed*
v. *Livingston.* The same doctrine was sustained in this State in
the case of *Pinney et al.* v. *Fellows*, 15 Vt. 536. In that case the
court remarked, "that upon the receipt of property by the hus-
"band from the wife, if, after marriage, he shall, for sufficient rea-
" sons, contract with the wife, that she may possess and enjoy sep-
" arately property bequeathed to her, or.inherited by her, or such
" as she may be the meritorious cause of acquiring, equity will
" uphold such post-nuptial agreements, in cases in which the claims
" of creditors will not be prejudiced by so doing;" and chancery
would need no better reason for upholding such agreements, than
the insolvency of the husband and his neglect to discharge his
marital obligations. The orator in this case was not a creditor,

at the time of this agreement, nor until a long time afterwards,— so long, that no inference can be drawn, or suspicion arise, that it was done in view of future indebtedness.

In such case it is equitable, that this agreement should be sustained, not only against the husband and his heirs, but against all others claiming under him, who at least were not creditors at the time, for he has parted with no property, that was his own. He has simply renounced all marital rights to the property of his wife, and which no creditor can compel him to exercise against his will, and which a court of equity would have required him to do, without such an agreement, not only in relation to the principal of her estate, but also to its income and profits, where a separation has taken place by act of the husband, or by their mutual consent.

So far, therefore, as the land, upon which the orator's execution was levied, was paid for by the property of the wife of Rufus Barron, we think this creditor can have no claim thereon for the payment of his debt.

It is further insisted, that about $300 was paid towards the farm by Rufus Barron from his own estate, independent of the money paid from the property of his wife. This is purely a question of fact; for no question has been made of the right of this creditor to the decree prayed for, if the money was so paid by him.

We are without the aid of an answer from Rufus Barron on this subject, who, it is to be presumed, could have told the amount and circumstances attending such payment, if made. The orator, however, has produced the testimony of Mrs. Burgess, Oliver Curtis and Mr. Jennings, from which it appears, that on different occasions Mrs. Sessions has stated, that Rufus Barron had an interest in the land of about $300, and that she was desirous of having it repaid for the benefit of his children by his former wife. Mrs. Sessions, in her answer, states the payment of the whole purchase money for the farm to have been made by her and the wife of Rufus Barron, and makes a distinct denial of any interests in him in the land. Mr. Perkins, the administrator, who assisted in purchasing the farm, and who was to see to the payment of the notes given therefor, states, that the whole sum, principal and interest, required for the payment of those notes, was raised from the

Barron *v.* Barron et al.

property of Mrs. Sessions and the wife of Rufus Barron and furnished by him for that purpose. If the testimony rested here, there is not that preponderance of testimony, that would warrant a decree for the orator. But the circumstance, that exerts a controlling influence upon this question, arises from the settlement made in 1844, when the agreement for separation was made and signed by Rufus Barron and his wife. That settlement was made with much deliberation, and with the aid and assistance of mutual friends; and as their difficulties had brought to its final termination their cohabitation as husband and wife, it was evidently their object and design to bring to a similar termination all matters in which they had a community of interest. The terms of their mutual separation were agreed to, as well as the future possession and support of their children. The claim of Rufus Barron, arising out of the occupation and use of the farm was the subject of their negotiation and settlement, and the same motive, that induced him to present his claim for improvements he had placed on the farm, in making fences, constructing water-courses, and increasing its general productiveness, would have caused him to present his claim for money advanced in its purchase, if he had so advanced it. Mr. Perkins and Mr. Benson both testify, that he made no such claim, and that they understood the only claim he had was in right of his wife, except for the improvements and personal property; and when the amount of his claims were stated and receipted, and the mutual releases between Rufus Barron and his wife executed, we can but believe, that it was considered a full settlement of all claims, that he had upon them, or the premises.

It becomes unnecessary to refer to the objection made, that Mrs. Barron is not made a party to this bill, as no decree is made affecting her interests. But we cannot perceive, how a decree could have been made for the orator, affecting the interests of the wife, without her being made a party defendant. *Grant and Wife* v. *Van Schoonhoven,* 9 Paige 255. Story's Eq. Pl. 207.

The result is, that the decree of the chancellor must be affirmed.