[ PHILADELPHIA, JANUARY 13TH, 1840. ]

## Estate of BENJAMIN HINDS.

### APPEAL.

1. Reduction into possession' by a husband of his wife's choses-in-action, is in all cases *prima facie* evidence of conversion to his use; but the presumption of intent may be repelled by disproof of the fact in the particular instance.

2. Where bank stock was bequeathed during the coverture to a wife, and was transferred to the husband absolutely, but he gave a refunding bond to the executor, with condition that the wife, her heirs, executors or administrators, should return the legacy, if required for payment of debts, and it appeared in evidence that the husband had spoken of the stock as the property of the wife, and had said that he gave the refunding bond as the surety of the wife, it was held that these facts were sufficient to rebut the presumption of his having converted the stock to his own use.

3. A woman having real and personal estate, married; and some years after the marriage the husband gave her a certificate stating that he had borrowed of her a certain sum, for which he promised to pay her the interest annually: *Held,* (in a case between the wife and the representatives of the deceased husband) that this paper furnished sufficient evidence that he held the money as trustee for the wife, and not in his own right; but that she was not entitled to interest upon it.

4. The husband during the coverture had put up a steam-engine on the real estate for the purpose of carrying on his trade: *Held,* that his representatives were entitled to remove it from the premises after his death.

THIS was an appeal from a decree of the Orphans' Court of Northampton County, in the matter of the settlement of the accounts of Elizabeth Hinds, administrator of the goods of Benjamin Hinds, deceased.

The circumstances of the case appear to have been as follows:

Benjamin Hinds, the intestate, was married in the year 1809 to Elizabeth Dehling, widow of John A. Dehling, who had died seized of a lot of ground in the borough of Easton, and possessed of some personal property, all of which he devised and bequeathed to the said Elizabeth.

No written contract or marriage settlement was executed before the marriage of Mr. and Mrs. Hinds, nor did it appear that there

(Estate of Benjamin Hinds.)

had been any verbal agreement between them in relation to the disposition of the estate which she owned or possessed before the marriage.

On the 6th day of June, 1815, Benjamin Hinds signed and delivered to his wife the following paper, and received from her the money therein mentioned.

" This is to certify to whom it may concern, that I, Benjamin Hinds, of the borough of Easton and state of Pennsylvania, have borrowed of Elizabeth D. Hinds, the sum of three hundred dollars, for which I promise to pay eighteen dollars annually, or to draw the interest of six shares from the Easton Bank.

Witness my hand this 6th day of June, 1815.

Witness present.                                BENJAMIN HINDS."
      J. Weygandt."

At the time of the marriage of Mr. and Mrs. Hinds, the improvements on the lot of ground belonging to his wife consisted of a squared log two-story house and a frame stable. About the year 1815, Mr. Hinds erected a building partly frame and partly stone, near the back end of the lot No. 1. The building had a basement, on two sides of which it was walled up with stone, and on the other two it was framed; it was two stories high above the basement story, of substantial frame, weather-boarded and shingled, about three and a half by sixteen feet. This he occupied for carrying on the carding and spinning business and for manufacturing carding machines. There was originally no chimney in the building. About the year 1817, he erected a two-story brick dwelling-house and kitchen or back building on the front of the lot in lieu of the log house, which was torn down. In this brick house Mr. and Mrs. Hinds continued to live until his death. In 1819 or 1820, Mr. Hinds erected another building where the stable had stood, partly stone and partly frame, on the rear of the lot No. 2, adjoining to and connected with the building first mentioned, and about the same size, and constructed very much in the same manner. It was used by him for several years for the same purpose as the first. About the year 1825, he erected an addition about sixteen by fourteen feet on the lot No. 3 at the east end of the first described building. The basement, like the other two buildings, was stone on two sides. The second story of frame. About the time the last building was put up he put a chimney in the first described building. When the rear building was put up, a chimney was carried up in it—the basement of that building being used for a blacksmith shop. About the year 1827, he erected a steam engine in the basement of (No. 1,) and adjoining to the north end thereof, to propel his machinery, in lieu of horse power, which he had previously used. There was a foundation sunk and a stone foundation wall put in: thence to the engine

(Estate of Benjamin Hinds.)

it was walled with brick; and the furnace connected with the chimney of No. 1; the wall of which had to be opened to let in the flue of the furnace.

About the first of December, 1834, and during the subsistence of the coverture of Mrs. Hinds, her mother, Mrs. Catharine Weygandt, died, having first made and published her last will and testament, which was proved on the 22d of December, 1834, dividing her estate among her daughters, of whom Mrs. Hinds was one. Under this will, Mrs. Hinds was entitled to six shares of Easton bank stock, which her mother had held in her lifetime. These six shares of bank stock were, on the 4th day of May, 1836, transferred by Jacob Weygandt, executor of Catharine Weygandt, to Benjamin Hinds, and in his presence. The transfer was absolute on the face of it; but Mr. Hinds gave a refunding bond to the executors, reciting the bequest to his wife Elizabeth Hinds, and with condition to be void "if the said Elizabeth, her heirs, executors or administrators shall and do retain the said legacy, or such part thereof as shall appear to be necessary for the payment of debts," &c.

Benjamin Hinds died on the 15th of December, 1836, intestate, and without children. Administration of his goods was committed to his widow, Elizabeth Hinds, who, on the 22d of July, 1838, settled an account of her administration; in which she claimed credit—

1st, For the sum of seven hundred and fourteen dollars, being the amount of the note given by the intestate on the 6th of June, 1815, with interest from that date.

2d, For the sum of four hundred and eight dollars, being the price or value of the six shares of Easton bank stock.

The account was referred by the Orphans' Court to auditors, who allowed her these credits, and refused to charge her with the price of the steam engine erected by the intestate, and which was sold by her after the death of the intestate, and with the value of the building or shop erected by him upon her land for the purpose of carrying on his trade. Evidence was given before the auditors to show that Mr. Hinds spoke of the bank shares as the property of his wife, and that he said he had given the refunding bond as her surety.

Exceptions having been taken to the report of the auditors, the questions were argued in the Orphans' Court, who made a decree confirming the report.

An appeal was then taken to this Court.

Mr. *Brodhead*, for the appellants.—The facts show that the husband exercised his marital rights over this property. The law will presume that the acts were done in accordance with his interest. By the rules of law a husband has the absolute right to goods in possession, and a right to reduce choses in action into possession. 2 *Story's Equity*, 630. *Clancy on Femes. Covert*, 2, 4. *Siter* v.

(Estate of Benjamin Hinds.)

*Jordan*, (4 *Rawle*, 474. 476.) Slight circumstances are sufficient to show intention. 2 *Kent's Com.* 342. *Schuyler* v. *Hoyt*, (5 *Johns. Ch. Rep.* 209-10.) 2 *Kent's Com.* 141. A husband can make no contract with his wife except in regard to her separate estate. 2 *Story's Equity*, 601. *Dibble* v. *Hutton*, (1 *Day's Rep.* 221.) *Shepard* v. *Shepard*, (7 *Johns. Ch. Rep.* 60.) 3 *Peere Wms.* 102. Personal property acquired after marriage belongs absolutely to the husband. *Reeves Dom. Rel.* 60. 63. 2 *Bac. Abr.* C. 3. *Griswold* v. *Penniman*, (2 *Conn. Rep.* 564.) A mere promise to the wife is *nudum pactum.* 3 *Atk.* 400. It is not in the power of the husband and wife by their private agreement to alter the rights or liabilities of the marriage condition. *Dougherty* v. *Snyder*, (15 *Serg. & Rawle*, 31.) *Towers* v. *Hagner*, (3 *Wharton's Rep.* 50. 57.) In regard to *fixtures*, the husband is tenant for life, as he is of the freehold; but the rule is not the same as to trade fixtures. *Gibbon's Law of Fixtures*, p. 15. 22. 2 *Harr. Dig.* 1180. 3 *Atk.* 12, 13. *Whiting* v. *Brastow*, (4 *Pickering*, 310.) Whenever a trade fixture can be sold during the tenant's life, it will go to the personal representatives after the tenant's death. *Lemar* v. *Miles*, (4 *Watts*, 332.) *Oves* v. *Oglesby*, (7 *Watts*, 106.)

Mr. *Maxwell*, and Mr. *A. E. Brown*, for the appellees.

This is not a case in which creditors are interested. The cases on the other side were principally questions between the husband and his creditors. The refunding bond is evidence of intention: then had the husband here the power? Siter v. Jordan, shows that he had. The agreement here is one which equity will enforce. *Towers* v. *Hagner.* The evidence shows that these were the earnings of the wife. A gift by a husband to the wife may be supported if there are no creditors. *Toller on Executors*, 226. A legacy to a wife is a chose in action and will survive to her. *Wintercast* v. *Smith*, (4 *Rawle*, 182.) *Siter* v. *Jordan*, (*Id.* 478.) The actual possession by the husband does not bar the wife's title unless it is intended to have that effect. *Miller's estate*, (*Ashmead*, 323.) The bank stock was received by the husband in this case as trustee for the wife. 2 *Story's Equity*, 601. *Livingston* v. *Livingston*, (2 *Johns. Chan. Rep.* 537.) *Tate* v. *Osborne*, (1 *Peere Wms.* 264.) 3 *Paige*, 614. *Stanwood* v. *Stanwood*, (17 *Mass. Rep.* 57.) *Sturret* v. *Wynn*, (17 *Serg. & Rawle*, 130.) *Bouslaugh* v. *Bouslaugh*, (17 *Serg. & Rawle*, 361.) The steam engine was part of the freehold and as such went to the wife's heirs. *Amos on Fixtures*, p. 9. *Morgan* v. *Arthurs*, (3 *Watts*, 140.) *Gray* v. *Holdship*, (17 *Serg. & Rawle*, 413.) *Union Bank* v. *Emerson*, (15 *Mass. Rep.* 159.) *White* v. *Arndt*, (1 *Wharton's Reports*, 91.) *Powell* v. *Thomson*, (3 *Mason* 464.)

Mr. *Brodhead*, in reply.

As to the bank shares it has been argued on the other side as if

(Estate of Benjamin Hinds.)

the wife had a separate estate, which is not the case. The cases cited are principally those of separate estates. The certificate was given several years after the marriage. There is no evidence to show that it was part of the money used for the estate. The wife treated the steam engines as personalty. The exception as to the building is not insisted upon. In *White* v. *Arndt,* the buildings were not erected for the purposes of trade. The case in 3*rd Atkins* is in point and the reasoning conclusive.

The opinion of the Court was delivered by

GIBSON, C. J.—Much of the confusion to be found in the books on the subject of a husband's power over his wife's choses in action, has arisen from viewing reduction into possession as identical with conversion to his use, and not as evidence of it. That it is evidence of it, and exceedingly powerful, must be admitted; yet it is no more. Were it very conversion, it could not be qualified; but it is well settled that the effect of it depends on the intent with which it is accompanied: and that it operates a conversion, or not, as it happens or not, to be an exercise of the wife's original dominion, of which the husband is the instrument, for the purpose of taking the property to himself. I have expressed my opinion on this subject in *Siter's Case* (4 *Rawle*, 475,) and I will not repeat it. It must be admitted, however, that reduction to possession is in all cases *prima facie* evidence of conversion, because it is accompanied in a vast majority of cases, with that intent; but that presumption of intent, like every other which is founded on experience of the current of human transactions, may be repelled by disproof of the fact in the particular instance: consequently the question here depends on the rebutting evidence of intention. In *Wall* v. *Tomlinson*, (16 *Ves.* 413,) a transfer, to a husband, of his wife's East India stock on an unwritten agreement that he should hold it in trust for her separate use, was deemed insufficient to give him such possession of it as would entitle his representative, because as it was significantly said, it had been made *diverso intuitu.* In that case, a verbal agreement was made before the transfer, and the evidence of it was clear; here the verbal evidence of trust consists of subsequent declarations; which, did the case depend on them, would be of little avail, for the reason that a man often promises, for the sake of domestic repose, what he has no intention to perform. But these declarations that the bank shares were still the wife's, are corroborated by the refunding bond given to the executor, and produced to him by the husband, as testified by the niece, in proof of his assertion. The condition of it is restitution by the wife and not by the husband—an act that could not be performed by her if the shares belonged to him. Restitution by any one, would questionless answer the purposes of the executor; but the designation of the wife as the person to make it, is a designation of her as the person in whom the beneficial owner-

(Estate of Benjamin Hinds.)

ship was to reside, and satisfactory proof that he received it as her representative and trustee.

The next exception stands on the same principle. As evidence of a contract, the husband's certificate of loan by his wife, would be destitute of force; but as evidence of his determination not to assert a title to the money actually reduced to his possession by the transaction—it assumes a character of decisive effect. Cannot a husband, so far as his own interest is concerned, use his wife's money, for a limited purpose, without impairing her right to it; or does the law impregnate it with his title by the touch, and cast the ownership of it on him against his will? Had the husband put the memorandum into the shape of a certificate of loan by the executor in whose hands the money stood, the transaction would not have borne a question; but in an inquiry after actual intention, we are to look at the substance of it without giving way to accidental circumstances of form produced by the ignorance of the parties. The object intended, was the use of the wife's money in consistence with her ownership of it; and as there are no technical words of stubborn import in the paper, it is our business to interpret it so as to produce the results which the parties intended; and it is enough to preclude the husband's ownership, that he intended to receive the money from the executor as his wife's trustee; of which the paper furnishes abundant evidence. Being void as a contract however, it can give her no claim to the produce of the money as interest.

The remaining exception is better founded. The steam engine put up by the husband to drive his carding and spinning mill, was clearly within the protection of that principle which obviates the conversion into realty, of fixtures for carrying on a trade; and though it was not such as might be removed by a tenant for years after the expiration of the term, as was asserted on good authority in *White* v. *Arndt*, it certainly might, in analogy to the doctrine of emblements, be removed, as against the remainderman, by the representative of a tenant for life or in tail after the expiration of the particular estate; as was held in the two leading cases of *Lawton* v. *Lawton*, and *Dudley* v. *Warde*. Why then should not a husband, or his representative, remove such a fixture as against the wife, after the termination of his seisin in her right, when there was the same uncertainty of its duration, and the same encouragement given to trade by the erection? I know of no case in point, but the principle of those cited, is applicable to the question in all its force. The auditor's report therefore is to be corrected by charging the accountant with the price of the engine and bricks sold by him; and the decree is affirmed for the residue.

Decree accordingly.