# OCTOBER TERM, 1863.

John J. Vreeland and wife *vs.* Henry Schoonmaker, administrator of Enoch J. Vreeland, deceased.

1. The act of 1852, "for the better securing the property of married women," *Nix. Dig.* 503, confers upon the wife no power of aliening or disposing of her separate property; she can only do so by the consent, and with the concurrence of her husband. She has the right of ownership, without the power of disposition.

2. The right of the husband to the wife's choses in action, as well as to her other property, real and personal, was extinguished by the act of 1852.

3. A bond given to the wife in her own name, and accepted by her *in lieu* of specific real and personal property to which she was entitled by inheritance, remains absolutely hers, as if she were a single female, and is not subject to the disposal of her husband.

4. The payment of such bond at its maturity to the husband, its subsequent investment by him in his own name, without objection by the wife, and his receipt of the interest, is no evidence (since the act of 1852) of the transfer of the property from the wife to the husband, or of the determination of her interest.

5. The reduction of a *chose in action* (the separate property of the wife) into possession, by the husband, without the consent of the wife, does not change the title of the property. The husband is accountable for so much of the estate of the wife, secured to her separate use, as has come into his hands.

6. Irrespective of the rights of the wife under the act of 1852, it is not every reduction by the husband, of the wife's choses in action into possession, that will vest the property absolutely in the husband. The ownership follows the will of the husband. But under that act, the husband has no right to convert the wife's choses in action to his own use. Such conversion is a violation of the rights of the wife.

7. The wife's assent to the reduction by the husband, of her choses in action into possession, for the mere purpose of re-investment, is no evidence of her assent to its conversion to the use of the husband.

8. If the wife's separate property consist of land, and she lives upon it, the husband may enjoy it jointly with her; if of chattels in possession, the husband may use them.

9. Though the wife may hold property in her own name, under the act of 1852, as if she were a *feme sole*, she can make no valid contract in re-

gard to it, nor can she enforce its collection, without the intervention of her husband.

10. The fact that while a husband and wife are living together, he should be permitted to take the interest or profits of her separate estate for their mutual benefit, or for his own use, should, as between *the husband and wife*, raise no presumption prejudicial to her rights.

11. The second section of the act of 1852 does not relate *only* to the property in existence when the law went into operation; it applies equally to *after acquired* property.

12. The bond having been collected by the husband, and the money invested in his own name, the widow cannot claim the protection of the act of 1851. *Nix. Dig.* 282, ¿ 35. That act extends only to the specific chattel or chose in action.

13. The Orphans Court has no authority to try disputed claims, except in the case of insolvent estates. In such case, either the executor or administrator, or any person interested, may file exceptions against the claim of any creditor, and the court are to hear the proofs, and decree and determine in regard to the validity of the claims. It is a settled principle, that the Orphans Court is not the proper tribunal for the trial of disputed claims. But by a disputed claim here, is meant a claim which is disputed by the executor or administrator, not a claim which the legatee or next of kin may deem unfounded or unjust.

14. If the executor or administrator disputes a claim, or refuses to pay it, the Orphans Court cannot allow it, or compel the executor or administrator to include it in his account. To justify the Orphans Court in allowing a claim against an estate, it must appear that the executor or administrator assented to, or recognized it as a debt due from the estate. But if the executor or administrator admit the claim, and pray allowance for it in his account, it is not a disputed claim within the meaning of the rule, and falls properly within the jurisdiction of the Orphans Court.

15. Claims against the estate, paid by the executor or administrator, constitute properly a part of his account. If a claim paid by an executor or administrator, is illegal and unfounded, the charge in the account is open to exception, and the question thus brought within the jurisdiction of the Orphans Court.

16. The mere fact that a debt or legacy has not been actually paid, constitutes no objection to its allowance upon the settlement of the account, if its existence is clearly established. By the settlement, the executor or administrator becomes liable for the amount thus allowed.

17. If an administrator, by collusion with the claimant, claims allowance for a debt not paid, in order to withdraw the cognizance of the question from the ordinary tribunals of law or equity, it is a good ground of exception before the Orphans Court, and the item may be stricken from the account.

18. An administrator is accountable for all property of the deceased, which came to his hands to be administered. He cannot be relieved from the accountability on the ground of loss, where the loss was occasioned by any default of his own.

19. Loans made on private or personal security, are at the risk of the trustees, who are personally answerable if the security prove defective. To afford complete indemnity to the trustee against the hazard of responsibility for loss, the investment must be made in government stocks, or upon adequate real security.

20. An executor or administrator cannot sell, and part with the possession of assets which have come to his hands to be administered, without requiring security for the price. If he sell under judicial sanction, he must pursue strictly the order of the court. If he sell upon credit, without judicial sanction and upon his own discretion, he must use due caution in obtaining adequate security. If he do otherwise, he acts at his peril; and if a loss is sustained by the insolvency of the purchaser, he is guilty of a *devastavit.*

This case came before the Ordinary on appeal from a decree of the Orphans Court of the county of Bergen.

Enoch J. Vreeland, the intestate, died May 4th, 1861, leaving him surviving, his wife, Sophia Vreeland, but no children. Eleanor Vreeland, one of the appellants, is his sister, and only next of kin. The respondent, Henry Schoonmaker, ministered on his estate, filed an inventory thereof, amounting to $10,542.24, and, on the tenth of September, 1862, filed his final account, showing

| | |
|---|---|
| Debits to the amount of.................................$11,234.49 | |
| Credits to the amount of................................ | 3,565.54 |

And a balance of........................................ $7,668.95

Among the credits claimed by the administrator in his account, are the following:

" He further prays allowance for amount received by Sophia Vreeland, widow, by bequest from her father during coverture with intestate, and which, at his death, remained in his possession,          $2,000.00

" He further prays allowance for amount due from John Blauvelt, on vendue book (desperate),          11.81

" Also, for amount due from Peter Maginnis, on
vendue book (desperate),                    $55.08

To these credits the appellants excepted. Evidence was
thereupon taken before the judges of the Orphans Court.
On the eighth of December, 1862, the court made a decree
overruling the exceptions and confirming the account, where-
upon the exceptants appealed.

The case, on the items excepted to, is this :

The two small items of $11.81 and $55.08, are amounts
due for goods of the intestate, which came to the hands of
the administrators, and which the latter sold at vendue.
Having failed to collect the proceeds of the sale, he asks to
be discharged the amount. By his own evidence, it appears
that one of the parties to whom he sold, was not deemed re-
sponsible.

The item of $2000 is claimed to be money of the intes-
tate's widow, Sophia Vreeland, which came to her in 1855,
from the estates of her father and mother, and which, having
been received by the intestate in his lifetime, swelled the
amount of his inventory to that extent. The administrator
claims the right to retain that amount for the benefit of the
widow.

The facts in relation to this money appear to be as follows :
Abraham L. Ackerman, the father of Sophia Vreeland, the
intestate's widow, died in 1855, leaving personal property to
the amount of $1500. Agnes Ackerman, his wife, died about
the year 1850. She owned the homestead farm. In this pro-
perty Sophia Vreeland had an interest, as one of the heirs. In
December, 1855, Sophia Vreeland's brothers, Lawrence and
Abraham, (while her husband was living) settled with her
and her sister, Hester, by giving them $2000 a piece, for
their share of the father's and mother's estates, giving to
Mrs. Vreeland, for her share, their joint and several bond
for $2000, dated December 24th, 1855, and payable May 1st,
1856. She and her sister gave their brothers a release of all
their interest in their father's and mother's estates, by deed

dated December 24th, 1855. Lawrence Ackerman paid her his $1000 on the first of May, 1856, which was put out at interest in. Enoch J. Vreeland's name. Abraham K. Ackerman paid his $1000 by giving his bond and mortgage therefor, when the joint bond became due. On this bond he paid $400 to Enoch J. Vreeland, a day or two before his death. This money was given to the administrator by Mrs. Vreeland. He inventoried it, and loaned it to Richard Berdan, and took his note therefor, payable to Sophia Vreeland, or bearer. This note is now held by the administrator as part of the estate of Enoch J. Vreeland. The balance, $600, was paid by note, dated May 1st, 1861, which was inventoried by the administrator, and afterwards paid to him. He put it all out at interest in his name, and holds the notes as securities.

*Hayes*, for the appellants.

1. The administrator must make good the amount of the small items for which allowance was made.

He knew that one of the parties was not responsible. He should have required security. Having failed to do so, he has become responsible by his negligence.

2. The $2000 is not due Mrs. Vreeland. The money was mixed with her husband's, and so became part of his general property.

The act of 1851 (*Nix. Dig.* 282) refers to specific chattels, furniture, &c.

*Wortendyke*, for the respondents.

We base our claim for $2000 upon the principle contained in the acts of 1851 and 1852.

These enactments limit the property of the wife to her separate use, as if it had been granted to her *separate use ;* as if, before the statute, it had been so granted.

1. The sale or transfer by Mrs. Vreeland to her brothers was not a strict sale, but a fair compromise or adjustment of

what ought to have been done by the will. Hence witnesses called it a legacy.

If the inheritance was the property of the wife, it comes within the policy of the married womens' and widows' acts. (*Nix. Dig.* 503, 282.)

The bond was given in *her name*, in the presence and with the assent of her husband. Lawrence Ackerman paid $1000, which was invested in bond and mortgage. Abraham paid $400 in cash, which was loaned by the administrator, and note taken therefor, payable to Sophia Vreeland, or bearer. The $600 he paid first by note, and eventually in cash. It was put out at interest by the administrator, in his name, and he now holds the notes therefor. The money was, therefore, in the estate.

Richard Berdan swore, that Enoch J. Vreeland said the money was his wife's. He intended to separate that money. That intention was in course of execution.

This question has been up in courts of equity before now. It is not material whether you call it a debt, or any other claim. 2 *Williams on Ex'rs* 1629; *State* v. *Reigart*, 1 *Gill* 1, *note.*

No question was raised about the money not having been paid. No inquiry was made as to how it was paid. By the very filing of the account it is appropriated to the use of Mrs. Vreeland. *Mosher* v. *Hubbard*, 13 *Johns. R.* 510.

2. As to the items sold and money not collected. 2 *Williams on Ex'rs* 1630–1629; *Meeker* v. *Vanderveer's Ex'rs*, 3 *Green's R.* 292.

Reasonable care and proper diligence only required. 11 *Wend.* 361; 6 *Halst. R.* 145.

*Bradley*, in reply.

I. The administrator having never paid this money, cannot be allowed a credit for it. *Dayton on Surr.* 508–9; *Willcox* v. *Smith*, 26 *Barb.* 346.

If it were a debt due himself, so as to give him the right of *retainer*, he might have appropriated it; but he has not

the prerogative of assuming the debts of the intestate as his own, and of pocketing so much money as will be sufficient to pay them. He may not pay them; they may never be demanded. If they are not paid, the benefit belongs to the estate and next of kin, and not to the administrator.

The Orphans Court cannot adjudicate disputed claims, except in cases of insolvent estates. *Miller* v. *Pettit*, 1 *Harr.* 421; *Nix. Dig.* 281, § 29; 589, § 70, 71. The administrator puts it forward as an experiment on the court, in order to make the court the tribunal for the collection of the debt.

The appellants question the widow's right to recover that money. Let her resort to the proper tribunal to establish her claim.

Or, if the administrator will take the responsibility of paying her, let him do so, and then bring in another account.

It would open the door to great frauds, to allow an executor or administrator to credit himself with the debts of an estate without having paid them.

He might never pay them at all, and leave them as an encumbrance on the legatees and next of kin.

He might never *have* to pay them, and thereby make a clear gain out of the money belonging to the estate.

He might compromise them at less than the amount charged for.

The administrator cannot claim this allowance, as for money received by *mistake*. No money of the widow stood separate from the intestate's property. *Johnson* v. *Corbert*, 11 *Paige* 265.

II. The widow, Sophia Vreeland, is not entitled to recover this claim of the administrator in any tribunal.

1. Not under the widow's act of 1851. (*Nix. Dig.* 282.)

By that act, the widow is entitled to demand of the administrator "all such goods and chattels, choses in action, or otler personal property which at coverture belonged to her, or which, during coverture, came to her by bequest, gift, or inheritance, and which, at her husband's death, remained in his possession."

This $2000 came to her undoubtedly, during the coverture, by "inheritance," not bequest, as alleged in the account. But it did not remain "in her husband's possession at his death." In order that *her* property may remain *in his possession*, it must be capable of identification.

If it was money, and was *lent* or *given* to him, or allowed to be *mixed* with *his* money, it became his, not hers. It became a mere *debt*, but not a *legal* debt, for a man cannot owe his wife a debt; a contract cannot be made between them.

Her property in it ceased as soon as its identity was lost. It was then a mere debt, which, as between husband and wife, is extinguished as soon as created. As soon as *property* ceases, *debt* arises.

2. Nor is she entitled to recover this money under the married womens' act of 1852. (*Nix. Dig.* 503.)

" The real and personal property of a married woman, with its rents, issues, and profits, shall not be subject to the disposal of her husband, but shall be her sole and separate property, as if she were single." *Section* 2. This relates to property in existence when the law was passed.

" It shall be lawful for a married woman to *receive* by gift, grant, devise, or bequest, and *hold* to her sole and separate use, as if she were single, real and personal property, and its rents, issues, and profits, and the same shall not be subject to her husband's disposal, nor liable for his debts." *Section* 3.

But if she does not choose to receive it; if she chooses to hand it over to him, and let him mix it with his own, she loses it.

She cannot lend it to *him*. They cannot contract together. No debt can be created between them. She cannot deal with her husband in that way.

3. Besides, this $2000 was in part in consideration of the husband's release. He was entitled to curtesy in the lands, and his release obtained. *Ross* v. *Adams*, 4 *Dutcher* 160; *Naylor* v. *Field*, 5 *Dutcher* 292.

4. The declaration of Richard Berdan, that Enoch J. Vreeland told him that Mrs. Vreeland had $2000 to put out, and

that he got $1000 of it, is not competent evidence. *Boylan* v. *Meeker,* 4 *Dutcher* 274.

Mr. *Bradley* further cited and reviewed the following cases: *Jackson* v. *Miller,* 1 *Dutcher* 90; *Ex'r of Henry* v. *Dilley,* *Ibid.* 302; *Johnson* v. *Parker,* 3 *Dutcher* 239; *Vannote* v. *Downey,* 4 *Dutcher* 219; *Wheaton* v. *Cooper,* 1 *Beas.* 221; *Green* v. *Pallas, Ibid.* 267; *Pentz* v. *Simonson,* 2 *Beas.* 232; *Wilson* v. *Brown, Ibid.* 277; *Skillman* v. *Skillman, Ibid.* 403; 3 *Rev. Stat.* (*N. Y.*) 183, § 81; *Magee* v. *Vedder,* 6 *Barb.* 352; *Wilson* v. *Baptist Educ. Society,* 10 *Barb.* 308, 316, 320; *Disosway* v. *Bank of Washington,* 24 *Barb.* 60; *Andrews* v. *Wallace,* 29 *Barb.* 350; *Dayton on Surr.* (1861) 378, 552, and note.

THE ORDINARY. The administrator of Enoch J. Vreeland, upon the settlement of his accounts in the Orphans Court, among other items for which he claimed credit, prayed allowance for $2000, "amount received by Sophia Vreeland (widow of the intestate), by bequest from her father during coverture with the intestate, and which, at his death, remained in his possession." Exceptions filed to the account by the next of kin of the intestate, were by the decree of the court overruled, and the account was allowed as audited and stated by the surrogate. From this decree the exceptants appealed.

The material question in the cause is, whether the sum of $2000, which formed the subject of exception, was in fact the property of the widow, or whether it belonged to the estate of her husband. It is admitted that the sum of $2000 came to Mrs. Vreeland during her coverture, in the year 1855, from the estates of her father and mother, and that it passed into her husband's hands and was inventoried. Her mother died about the year 1850, seized of certain real estate. Her father, Abraham L. Ackerman, died on the 9th of April, 1855, intestate, whereupon his children became each entitled to a share of his estate, as well as of the estate of the mother. In December, 1855, Lawrence and Abra-

ham Ackerman, two of the sons of Abraham L. Ackerman, agreed with their sisters to give them each $2000 for their respective shares of their father's and mother's estates. In fulfilment of this agreement, on the 24th of December, 1855, Lawrence and Abraham Ackerman gave to Mrs. Vreeland for her share, their joint and several bond for $2000, payable on the first of May, 1856. This bond was given to Mrs. Vreeland with the knowledge and assent of her husband, who, thereupon, joined with his wife in a conveyance to her brothers, of all the real estate which she inherited from her mother. It is clear that the property, both real and personal, was the property of the wife, and by operation of the "act for the better securing of the property of married women," became her sole and separate property, and was not subject to the disposal of her husband. It is true that she had no power of aliening or disposing of the property, except by the consent and with the concurrence of her husband. She had the right of ownership, without the power of disposing of it. That power the statute does not confer. Had the property remained in her possession undisposed of, upon the death of her husband, it would have been hers absolutely. It would have formed no part of her husband's estate. Is that title lost by her settlement with her brothers, and receiving their bond in lieu of the estate to which she was specifically entitled? Had she accepted, in lieu of her property, a bond made payable to her husband, so unequivocal an expression of her will, might be regarded as evidence of her intention that the property should become her husband's. But the bond was taken in her own name, and was made payable to her, her executors, administrators, or assigns. Such bond was a valid instrument in the wife's favor at common law.

The husband, it is true, by virtue of his marital rights, acquired a qualified right to the property. He had the right, during the joint lives of himself and wife, to collect the money and appropriate it to his own use. If he survived the wife, it was his. But if the husband died without re-

2 x *

ducing the chose in action into possession, it remained the property of the wife. 2 *Bl. Com.* 434; 2 *Kent's Com.* 135; *Clancy's Husb. & Wife* 5.

But the right of the husband to the wife's choses in action, as well as to her other property, real and personal, was extinguished by the act of 1852. The bond in question, accepted by the wife in lieu of the specific personal and real property which she took by inheritance, remained absolutely hers as if she were a single female, and was not subject to the disposal of her husband. How has *her* title to that property become extinguished? How has the husband acquired title to it? It must be borne in mind that she had both the legal and equitable title to the bond, and to the proceeds of it. She never assigned it to the husband. If she had done so, the assignment would have been inoperative and void at law. She can make no valid contract with any one, much less with her husband, for the transfer of her legal rights. But it is insisted that the facts, that the bond at its maturity was paid to the husband, and was subsequently invested by the husband in his own name, without objection on the part of the wife, and the interest received by him, are plenary evidence of the transfer of the property from the wife to the husband, and of the determination of her interest. That undoubtedly would have been the effect of the collection of the money by the husband, with or without the wife's consent, prior to the enabling act of 1852. But since the passage of that act, she takes and holds the property as a single female. If, as a single female, she had permitted a third person, or if, as a wife, she had permitted a person other than her husband, to receive and collect her moneys, and invest them in his own name, it would have afforded no evidence of the renunciation of her right, or of his ownership of the property. He would be regarded, both at law and in equity, as her agent or trustee. The reduction of the choses in action into possession by the husband, without the consent of the wife, cannot change the title of the property. If by marriage settlement, the estate of the wife be secured

to her separate use, the husband is accountable for that part of it which comes to his hands. 2 *Kent's Com.* 164. Irrespective of the right of the wife under the act of 1852, it is not every reduction by the husband of the choses in action into possession, that will vest the property absolutely in the husband. The ownership follows the will of the husband. *Hinds' Estate*, 5 *Wharton* 138; *Barron* v. *Barron*, 24 *Vt.* 375; 2 *Bl. Com.* 434, *note* 2, *by Sharswood.*

The reduction into possession is, in all such cases, *prima facie* evidence of conversion to his use. He is exercising a right which the law gives him over his wife's choses in action. But under the enabling act of 1852, the husband has no such right over the choses in action of his wife. The absolute interest is in the wife. A conversion of them by the husband to his own use, is a violation of that right. The law, therefore, will not presume, that from the mere reduction of the wife's choses in action into possession, he intended to convert them to his own use, in violation of the rights of the wife. Nor will the wife's assent to the reduction by the husband of her choses in action into possession, for the mere purpose of re-investment, be evidence of her assent to its conversion to the use of the husband. There is in the case no evidence of the intention of the husband to convert the property to his use, or of the assent of the wife to such conversion, other than the mere fact that the money due on the bond having been paid to the wife, was permitted to be invested and re-invested by the husband in his own name, and that the interest was collected by him. These circumstances, in themselves, are not evidence of the conversion of the wife's property to the use of the husband. But the right of the wife does not rest upon this evidence alone. It is shown that an application for a loan of money having been made to the husband shortly before his death, he told the applicant that his wife had $2000, and he would see what she had to say about it. And he subsequently stated that his wife had given her consent, and thereupon made the loan. Now it must be admitted that this evidence is utterly inadequate

to prove a transfer of property from the husband to the wife, but it is, nevertheless, competent as tending to evince the absence of intention on the part of the husband to convert the wife's money to his own use. Upon a question between the estate of the husband and the wife, I see no objection to the competency of this testimony. In *Gray's Estate*, 1 *Barr*. 327, it was held, that a husband's disclaimer of conversion to his own use, at the time of reducing his wife's choses in action into possession, may be established by his subsequent admissions.

Nor is the case materially altered by the fact, that the husband is permitted to take and use the interest of the money while it remains in his hands. That may be done for the joint benefit and support of the husband and wife, while they live together. In fact, the nature of the relation is such, that while it continues, neither can ordinarily have a sole and exclusive enjoyment of their individual property. If the wife's property consists of lands, and she lives upon it, the husband may enjoy it jointly with her. If of chattels in her possession, the husband may use them. The legal relation of husband and wife is so intimate, that it necessarily involves, to some extent, a common use of their individual property. It was not intended that the statute for the better securing the property of the wife, should impair the intimacy and unity of the marriage relation. *Walker* v. *Reamy*, 12 *Casey* 414; *Naylor* v. *Field*, 5 *Dutcher* 292.

It is clear that the intervention of no trustee is essential to protect the legal rights of the wife. That is the necessary result of the enabling act of 1852. Her property is protected in her own hands, as well against the claim of the husband, as against strangers. She may receive and hold property in her own name, as if she were a feme sole. But though she may hold, she cannot manage the property without the intervention of an agent. She can make no valid contract in regard to it, nor can she enforce its collection, without the intervention of her husband.

Admitting that the funds of the wife may lawfully be en-

trusted by her to a third person for investment, why should she be compelled to have recourse to such agency ? Or why should the mere fact that they are entrusted to the management and control of her husband, be evidence of the renunciation of her rights, or of the transfer of her property ? It would seem that there is no one to whom the care of the wife's property can more naturally, and with more propriety be entrusted, than the husband. And if, while they are living together, he is permitted to take the interest or profits of the estate for their mutual benefit, or for his own use, it should, as between the husband and wife, raise no presumption prejudicial to her rights. I say as between the husband and wife, because it is obvious that, as it regards the interests of third parties, the possession and control of the funds of the wife by the husband in his own name, may create equities and give rise to questions of fraud, which will involve very different considerations. It has been held in the state of New York, that where the husband, by the permission and agreement of the wife, has the exclusive control of her separate estate and its accumulations, by means whereof he is enabled to obtain credit and carry on trade, the property is liable to the claims of the husband's creditors. *Sherman* v. *Elder*, 1 *Hilton* 476.

It is worthy of notice in this connection, that the enabling statutes of the state of New York confer upon married women, powers in regard to the disposition and management of their estates, not conferred by the laws of this state. The statute of 1848, as amended by that of 1849, enables a married female not only to take and hold her property to her separate use, but also to convey and devise real and personal property, and any interest therein, in the same manner and with like effect as if she were a feme sole. And by the act of 1860, it is enacted that her sole and separate property may be used, collected, and invested by her in her own name.

In the case now under consideration, the question as to the title of the property, is exclusively between the wife and the estate of the husband. The question is embarrassed by no

intervening equities, or claims of creditors.   There is a large surplus in the hands of the administrator, to be distributed agreeably to law.   I think the wife is clearly entitled to the sum of $2000, for which allowance is claimed by the administrator in his account.

It was urged upon the argument, that the second section of the act of 1852 relates only to the property in existence when the act was passed.   I have never understood that this was the true construction of the statute.   A directly contrary interpretation has been adopted, both in this state and the state of New York, where, with the exception of the last clause, the language of the section is identical.

It is the settled rule of construction in New York, that the second section of the act has no application to property which a wife, married before the act took effect, had at the time of the marriage, or had already acquired during coverture, but that it applies to after acquired property of females, married prior to the act.   *Snyder* v. *Snyder,* 3 *Barb.* 621; *Holmes* v. *Holmes,* 4 *Barb.* 295; *White* v. *White,* 5 *Barb.* 474; *Hurd* v. *Cass,* 9 *Barb.* 366; *Perkins* v. *Cottrell,* 15 *Barb.* 446; *Smith* v. *Colvin,* 17 *Barb.* 157; *Watson* v. *Bonney,* 2 *Sandf. S. C. R.* 405; *Kelly* v. *McCarthy,* 3 *Bradf.* 7.

In the case of *Ex'r of Henry* v. *Dilley,* 1 *Dutcher* 302, it was held that the act operated as a protection of the rights of property of the wife, existing at the time the act took effect. But it was not decided in that case, nor was it intended to be decided, that the act related only to subsisting rights.   The question was, whether the second section of the act was designed at all to affect subsisting rights, and if it was so intended, whether it was not an unauthorized interference with the vested interest of the husband in the property of the wife. Admitting the decision in that case to have been correct, it does not support the position, that the section relates *only* to the property in existence when the law went into operation. Nor does the case of *Vannote* v. *Downey,* 4 *Dutcher* 219, nor any other reported case which has been referred to, sustain the doctrine contended for.

The decree of the court below can derive no support from the provisions of the act of March 12th, 1851, for the relief of widows in certain cases. *Nix. Dig.* 282, § 35. That act, by its terms, extends only to the specific chattel, chose in action, or other personal property, which belonged to the wife at her marriage, or which subsequently came to her, and which remained in the hands of the husband unchanged, at his death. Had the bond given to the wife during her coverture remained in the hands of the husband until his death, the case would have fallen within the operation of that statute. But the bond having been collected by the husband, and the funds, in whole or in part, invested in his own name, it is clear that the widow cannot claim the protection of the act. The act of 1851 effected no change in the rights of the widow to her *choses in action*, acquired before, or during her coverture, and remaining in the hands of the husband at the time of his death. But, in terms, it transfers the title to the wife's *chattels* in possession of the husband, from the estate of the husband to the wife, saving the rights of the husband's creditors.

It is further urged that this claim is disputed, and therefore, is not the proper subject of adjudication in the Orphans Court; that the exception should have been allowed, and the widow compelled to resort to the ordinary tribunals of law or equity for the recovery of her claim. Our statute has conferred no authority upon the Orphans Court to try disputed claims, except in the case of insolvent estates. In such case, either the executor or administrator, or any person interested, may file exceptions against the claim of any creditor, and the court are to hear the proofs, and decree and determine in regard to the validity of the claims. In all other cases it is a settled principle, that the Orphans Court is not the proper tribunal for the trial of disputed claims. But by a disputed claim here, is meant a claim which is disputed by the executor or administrator, not a claim which the legatee or next of kin may deem unfounded or unjust.

If the executor or administrator disputes the claim, or re-

fuses to pay it, the Orphans Court cannot allow it, or compel the executor or administrator to include it in his account. To justify the Orphans Court in allowing a claim against an estate, it must appear that the executor or administrator assented to, or recognized it as a debt due from the estate. *Wilson* v. *Baptist Ed. Soc.*, 10 *Barb.* 320; *Andrews* v. *Wallace*, 29 *Barb.* 350; *Disosway* v. *Bank of Washington*, 24 *Barb.* 60.

But if the executor or administrator admit the claim and pray allowance for it in his account, it is not a disputed claim within the meaning of the rule, and falls properly within the jurisdiction of the Orphans Court. The administrator is the legal representative of the estate, and as a general rule, he may, at his discretion, and without the assent of those interested in the estate, pay or compromise any claim against it, even though barred by the statute of limitations. Claims against the estate paid by the executor or administrator, constitute properly a part of his account. If the claims are illegal or unfounded, the charges in the account are open to exception, and thus the question is brought within the jurisdiction of the Orphans Court.

It is further insisted that the claim was not in fact paid, and that it was not a proper charge against the estate by the administrator, until it *was* paid by him. The mere fact that a debt or legacy has not been actually paid, constitutes no objection to its allowance upon the settlement of the account, if its existence is clearly established. Accounts are thus frequently settled, where the legatee or creditor is absent, or not in a situation to receive payment. By the settlement, the executor or administrator becomes liable for the amount thus allowed. No prejudice is occasioned to those interested in the estate. But it is urged that the administrator is, or may be, unwilling to assume the responsibility of paying the claim, but by collusion with the claimant, claims allowance for the debt, in order thus to withdraw the cognizance of the question from the ordinary tribunals of law or equity. There is, to my mind, much force in the objection. And had this

exception been taken in the court below, before evidence had been heard upon the merits, and had the court been called upon, then, to strike the item from the account, upon the ground now urged for reversal, I think the objection should have been sustained, and if overruled, it would have presented a just ground for reversal upon appeal. But it does not appear that this was made a ground of objection before the Orphans Court, either before the evidence was taken and the hearing had upon the merits, or at any stage of the proceedings. It was, in fact, not made the ground of exception in that court, although it appears upon the face of the account, that no voucher had been taken for the payment of the money, and the form of the claim shows that the money had not been paid. Nor is this objection made the ground of appeal in this court. The specific ground of appeal is that " the item of $2000, claimed by the administrator as due to Sophia Vreeland, and allowed by said decree, is unjust and illegal, the said Sophia having no just or legal claim to the same." It would seem, from the proceedings in the court below, that the parties voluntarily submitted the question upon the merits to the decision of the Orphans Court, for the purpose of having it decided in the most easy and expeditious mode. Under these circumstances, I do not think that it lies in the mouth of the appellant now to complain, that he is deprived of a hearing before the ordinary tribunals of justice, or before the Court of Appeals in the last resort.

And as the claim has manifestly been made in good faith on the part of the widow, as there is no reason for suspecting the existence of collusion, or a want of good faith on the part of the administrator, as there has been a full and fair hearing and decision upon the merits, I do not feel justified in now turning the parties around, and permitting the appellants to try the experiment of obtaining a different decision in another tribunal.

Exceptions were also taken to two small items of the account, being respectively for $11.81 and $55.08, for which

the administrator prayed allowance " as desperate." The exceptions were disallowed in the court below. And this con-stitutes another ground of appeal from the decree. The items consisted of two vendue accounts for goods, which were included in the inventory, and which were sold by the administrator upon credit, without security. The purchaser of the smaller bill was known at the time to be irresponsible, but the goods were taken away by him without permission. The other purchaser was regarded as solvent. He gave his note for the amount of his purchase, without security, payable on demand to the administrator, in his individual name.

It is a fundamental principle, that the administrator is accountable for all property of the deceased which came to his hands to be administered. He cannot be relieved from this accountability on the ground of loss, where the loss was occasioned by any default of his own.

It is a well settled rule, both in England and in this state, that if executors, administrators, or other trustees, *loan* money without due security, they are liable in case of loss. *Loans* made on private or personal security, are at the risk of the trustees, who are personally answerable if the security prove defective. To afford complete indemnity to the trustee against the hazard of responsibility for loss, the investment must be made in government stocks, or upon adequate real security. *Gray* v. *Fox, Saxton* 259; 2 *Williams on Ex'rs* 1539, 1541.

*Sales* by executors and administrators, both of real and personal estate, are regularly made for cash, without credit; or by sanction, and under the direction, of some judicial tribunal, prescribing the extent of the credit and the nature of the security.

In some of the states of the Union, personal property is thus sold by direction of the Ordinary, and usually upon personal security.

In this state a practice has long prevailed, of permitting an executor or administrator to sell personal property, either for cash or upon short credits, with approved personal secu

rity, at his discretion. The custom of selling upon short credits, and upon personal security, without direct judicial authority, has been sanctioned by long and general usage. In practice, it is advantageous to the interests of the estate. Higher prices are obtained, and usually without loss. Cash sales will, in most cases, necessarily be made at lower rates. Where sales are thus made, and security taken with due caution, the executor or administrator is chargeable with no default, and is not liable in case of loss. But in this case, the administrator made the sales in question upon the personal liability of the purchasers, without security of any kind. In the one case, no note was taken; in the other, the individual note of the purchaser. One of the purchasers was known to the administrator to be unworthy of credit; the other, from whom the note was taken, was supposed to be responsible. The conduct of the administrator in both cases was entirely indefensible. I know of no practice to countenance it, and no principle upon which such practice can be justified. On the contrary, I believe the principle to be of universal application, admitting of no exception or qualification, that an executor or administrator cannot sell and part with the possession of assets which have come to his hands to be administered, without requiring security for the price. If he sell under judicial sanction, he must pursue strictly the order of the court. If he sell upon credit, without judicial sanction, and upon his own discretion, he must use due caution in obtaining adequate security. If he do otherwise, he acts at his peril; and if a loss is sustained by the insolvency of the purchaser, he is guilty of a *devastavit.*

I am not aware of any judicial decision upon the point in this state, but I regard the principle as unquestionable, and it is sustained by abundant authority in other states.

In *King* v. *King's Adm'rs*, 3 *Johns. Ch. R.* 552, the administrators sold the leasehold estate of the intestate on credit, and took a promissory note of the purchaser, without security. The purchaser paid part of the purchase money, but became insolvent before the residue could be collected.

The administrators were held responsible for the loss. The Chancellor (Kent) directed that they should be charged with the whole amount of the purchase money, holding them guilty of negligence in parting with the leasehold estate without payment or security. The principle is sustained by numerous authorities. *Orcutt* v. *Orms*, 3 *Paige* 459; *Stukes* v. *Collins*, 4 *Desaus.* 207; *Massey* v. *Cureton, Cheves* 181; *O'Dell* v. *Young*, 1 *McMullan's Eq.* 155; *Dillebaugh's Estate*, 4 *Watts* 177; *Johnston's Estate*, 9 *Watts & Serg.* 108.

I have dwelt thus long upon this point, which seems too clear to admit of doubt or to require discussion, because the administrator was not charged with this loss by the respected tribunal by whom this cause was originally decided. I have looked with some solicitude, to discover the ground upon which that decision could have been based. It may have been, because they believed that the administrator acted in good faith. I entertain no doubt that he did act in entire good faith, but if the money was lost by his default, the purity of his motives cannot relieve him from his obligation to make good the loss. Or, the court may have decided, upon the principle that the executor was bound only to use ordinary caution in the management of the estate. That principle is admitted. An executor or administrator is bound to use the same caution and circumspection, that a prudent man would use in the conduct of his own concerns. But no prudent man, influenced by the ordinary motives of self interest, and acting with due caution, will let out his money or sell property on credit, without a responsible security for its payment. But the more decisive answer to the suggestion is, that in parting with the assets of the estate to a purchaser without security, the administrator was violating his duty, and was guilty of a default. The law allows no exercise of discretion upon that point. He is bound to require security. In deciding what security he will accept, he acts at his discretion. He is bound to use ordinary caution only, and if the security prove inadequate, the administrator, acting in good faith, is not responsible. The case is not altered by the fact that the goods were removed by one

of the purchasers, without the knowledge or consent of the administrator. He took no step to obtain security, or compel a restoration of the goods.

The administrator is responsible for the loss sustained by the neglect to require security. Both claims should have been disallowed, and the decree and account must be corrected accordingly. In all other respects the decree is affirmed.

The main question involved in the cause was novel and proper to be heard before this court. Costs will be allowed to neither party as against the other.