## Case No. 7,456.

JONES v. BUCHANAN et al.

## Case No. 7,457.

### JONES v. CLIFTON.

[2 Flip. 191; 17 Am. Law Reg. (N. S.) 713; 6 Reporter, 324; 7 Cent. Law J. 89; 18 N. B. R. 125.] [1]

Circuit Court, D. Kentucky. July, 1878. [2]

---

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission. 6 Reporter, 324, contains only a partial report.]

[2] [Affirmed in 101 U. S. 225.]

B. H. Bristow and Jas. A. Beattie, for plaintiff.

Bijur & Davie, for defendant.

BALLARD, District Judge. On the 3d of October, 1872, the defendant, Chas. H. Clifton, being then free from debt, and with a fortune probably exceeding two hundred and fifty thousand dollars, conveyed to his wife, without the intervention of a trustee, a small parcel of land, worth about seven hundred dollars, and assigned to her five policies of insurance on his life, each for ten thousand dollars, but at the time not worth more in the aggregate than twelve thousand dollars. On the 1st of April, 1873, being still free from debt, and with his fortune very little diminished, he made another conveyance to his wife, also without the intervention of a trustee, of two parcels of land, one situated in the city of Louisville and the other in the county of Jefferson. The first parcel was, at the time of this conveyance, and still is, incumbered by mortgage to probably its full value. The other parcel was the homestead of the ancestors of the grantor, and was estimated to be worth eighteen thousand dollars. On this parcel he afterwards erected a dwelling-house which cost eight thousand five hundred dollars.

By both deeds, and substantially in the same terms, the property was conveyed "to the said Nannie to hold to her and her heirs forever as her own separate estate, free from the control, use, and benefit of her husband." By both deeds, and substantially in the same terms, power and authority were conferred on the grantee to appoint the parcels of land and each or all of them, or part or parts of each, as often as she might choose to exercise the same, to such uses as she might designate by joint deed with her husband, or by a writing in the form of and to take effect as a devise under the statute of wills of Kentucky; and by both deeds, in substantially the same terms, the grantor expressly reserved to himself power to revoke the grants in whole or in part, and to appoint to any such uses or persons as he might designate either by deed or last will. In default of appointment, or to the extent that the grantor might fail to appoint, each of said parcels of land was to remain to the grantee and her heirs forever as her separate estate, with the powers conferred upon her as above stated.

On the 4th of December, 1875, Clifton filed his voluntary petition in bankruptcy, and was adjudged bankrupt thereon, and the complainant, Stephen E. Jones, was appointed his assignee. In October, 1876, the assignee brought this suit in equity, in which he seeks to have both of the above-mentioned deeds declared void, and thus the clouds removed from his alleged title to the parcels of land and policies of insurance mentioned therein.

The bill proceeds on three grounds, all more or less connected, but still so distinct as to require a separate statement: First—That the making of the two instruments was a contrivance and scheme on the part of Chas. H. Clifton to cheat, hinder and defraud his future creditors. Second—That the conveyances having been made by the husband to the wife, without the intervention of a trustee, are, because of this, and because of the reservations contained therein, especially the absolute power of revocation, void, and so passed no title or interest to the nominal grantee. Third—That by operation of the bankruptcy act the property described in the instruments, or, at least, the powers of revocation therein reserved, passed to the complainant as assignee in bankruptcy. I shall examine each of these grounds separately.

The complainant has offered no testimony whatever of the alleged fraudulent intent. He does not even allege that the grantor at the time the conveyances were executed owed anything. The uncontroverted proof is that he was then free from debt; that he was not then engaged in trade; that he did not contemplate engaging in trade or contracting debts; that he was an indiscreet young man, who, though possessed of a large fortune, might squander the whole in reckless gaming and dissipation; that the settlements were made at the suggestion of his more prudent wife, and did not embrace more than one-sixth of his estate.

That Clifton might, under these circumstances, by proper conveyances, have settled on his wife this amount of property, free from all claims proceeding from his future creditors, or from his assignee, is indisputable. The authorities everywhere sustain such settlements. Sexton v. Wheaton, 8 Wheat. [21 U. S.] 229; Hinde v. Longworth, 11 Wheat. [24 U. S.] 211; Haskell v. Bakewell, 10 B. Mon. 206; Loyd v. Fulton, 91 U. S. 485; Smith v. Vodges' Assignees, 92 U. S. 183. Authorities to the same point might be multiplied indefinitely.

The learned counsel of complainant them-

selves do not dispute that such settlements are generally unimpeachable. Their contention is that the settlements in controversy here were not made by proper conveyances; that the conveyances being made by the husband to the wife without the intervention of a trustee are void in law, and that by reason of the powers of revocation reserved they are void both in law and in equity.

It thus appears that the complainant does not now ask relief on the ground of the distinct fraud alleged. If he attaches any importance to the allegation of fraud contained in his bill, it is only because he considers that a deed made by a husband to his wife, containing a reservation of an absolute power to revoke it, is per se fraudulent. Thus considered, the complainant's first ground becomes blended with the second, and one and the same with it; and I proceed, therefore, to consider the second ground.

Under the common law system the husband and wife are, for most purposes, regarded as one person. As a result of this legal unity, their contracts with each other, whether executory or executed, in parol or under seal, are void. This doctrine, it must be confessed, has little foundation in reason. It is wholly unknown in that enlightened system of jurisprudence which, coming down to us from the ancient civilizations, now prevails on the continent of Europe, and it has only a faint recognition in the system of equity jurisprudence which in England and in this country, has grown up by the side of the common law. In equity the husband and wife are for many purposes treated as two persons. Whilst at law all the personal property of the wife becomes on marriage the property of the husband, and the entire management and profits of her real estate pass to him, in equity she may not only own and manage her real and personal estate, but she may dispose of it free from the control of her husband. True, it was at one time doubted whether any interest in either real or personal property could be settled to the exclusive use of a married woman, without the intervention of trustees; but for more than a century and a quarter it has been established in courts of equity that the intervention of trustees is not indispensable, "and that whenever * * * property * * * is settled upon a married woman, either before or after marriage, for her separate and exclusive use, without the intervention of trustees, the intention of the parties shall be effectuated in equity, and the wife's interest protected against the marital rights of her husband, and of his creditors also." 2 Story, Eq. Jur. § 1380.

Nor is it at all material whether the settlement is made by a stranger or by the husband himself. In either case the trust will attach upon him, and will be enforced in equity. It is now universally held that a settlement made by a husband on his wife by direct conveyance to her, will be enforced in the same manner and under the same circumstances that it will be when made by a stranger, or when made to a trustee for her exclusive use. Shepard v. Shepard, 7 Johns. Ch. 57; Jones v. Obenchain, 10 Grat. 259; Sims v. Rickets, 35 Ind. 192; Thompson v. Mills, 39 Ind. 532; Putnam v. Bicknell, 18 Wis. 335; Burdeno v. Amperse, 14 Mich. 91; Barron v. Barron, 24 Vt. 398; Maraman v. Maraman, 4 Metc. (Ky.) 84; Wallingford v. Allen, 10 Pet. [35 U. S.] 594.

All voluntary conveyances, whether made wholly without consideration or upon the meritorious consideration of love and affection, are scrutinized and regarded with some suspicion in courts of equity, when they are sought to be impeached by creditors. But I have been referred to no case, and I have found none which hints that a reasonable settlement made by a husband, free from debt, on his wife by direct conveyance to her. is any more impeachable than when it is made through the intervention of trustees. Settlements made in either mode, when uncontaminated by actual fraud, are unimpeachable by subsequent creditors.

It may be admitted that a power of revocation, inserted in an assignment made by a debtor for the benefit of his creditors, would render such assignment constructively fraudulent, and therefore void. Riggs v. Murray, 2 Johns. Ch. 576, 15 Johns. 571; Tarback v. Marbury, 2 Vern. 510. But such power of revocation has never been held to affect a family settlement. On the contrary, in the above case of Riggs v. Murray, Chancellor Kent expressly declares that "family settlements may often require such powers of revocation to meet the ever-varying interests of family connections." Moreover, it is the well-settled practice in England to insert such powers in such settlements, unless, indeed, the sole object of the settlement is to guard against the extravagance and imprudence of the settler. Indeed, ever since Lord Hardwicke's time, the failure of the conveyancer to insert a power of revocation in a deed of family settlement has been regarded as a strong badge of fraud. Huguenin v. Baseley, 14 Ves. 273.

In some of the later cases such settlements have been annulled at the suit of the settler, apparently on the sole ground that they did not contain a power of revocation. In Coutts v. Acworth, L. R. 8 Eq. 558, it was held that "the party taking a benefit under a voluntary settlement * * * containing no power of revocation, has thrown upon him the burden of proving that there was a distinct intention on the part of the donor to make the gift irrevocable." In Wollaston v. Tribe, L. R. 9 Eq. 44, the same rule is recognized and enforced. In Everitt v. Everitt, L. R. 10 Eq. 405, the chancellor in annulling a deed of settlement made by a young woman soon after she arrived at age. chiefly on the ground that it contained no power of revocation, says, in substance: "The sole object of the

settlement being to protect the settler and her children, if she married, had I been called on for advice, I should have said: 'Have proper trustees, give her a voice in the selection of new trustees, and give her a power of revocation with the consent of the trustees.'"

In Phillips v. Mullings, 7 Ch. App. 244, the court of appeals recognized the same general rule, but in that case refused to annul the settlement, though it contained no power of revocation, on the distinct ground that the settlement was made by a young man of improvident habits to guard against his own folly, and "the deed was explained to him and the particular clauses brought to his notice." "Those who induce," said the lord chancellor, "a young man of this description to execute such a deed, are bound to show that the deed is in all respects proper, or, if the deed contains anything out of the way, that he understood and approved it. * * * It is not necessary to show that the usual clauses inserted by conveyancers were explained, but any unusual clauses must be shown to have been brought to his notice, explained and understood." In Hall v. Hall, L. R. 14 Eq. 305, the vice-chancellor regarded the rule as so firmly settled that he felt impelled to annul a settlement twenty years after its execution, simply because it did not contain a power of revocation. The same rule has been recognized and adopted in the United States. Russell's Appeal, 75 Pa. St. 269; Garnsey v. Mundy, 24 N. J. Eq. 243. Some chancellor has intimated that a voluntary settlement partakes very much of the nature of a last will, and that it should be scarcely less revocable.

I feel much difficulty in yielding assent to the extreme doctrine announced in some of these cases, and I am glad to observe that it is somewhat modified and limited by the late case of Hall v. Hall, decided by the court of appeal in chancery in 1873 (8 Ch. App. 430). I quite agree with what Sir W. M. James, L. J., says in this case: "The law of this land permits any one to dispose of his property gratuitously if he pleases, subject only to the special provision as to subsequent purchasers and as to creditors. The law of this land permits any one to select his own attorney to advise him, and it seems very difficult to understand how this court could acquire jurisdiction to prescribe any rule that a voluntary conveyance, executed by a person of sound mind, free from any fraud or undue influence of any kind, and with sufficient knowledge of its purport and effect, should be void, because the attorney of his own selection did not advise him to insert a power of revocation, or did not take his express direction as to the insertion or omission of such power." The true rule is that laid down by Lord Justice Turner, 3 De Gex, J. & S. 487, 491, that the absence of a power of revocation is a circumstance to be taken into account, and is of more or less weight according to the circumstances of each case.

In the case now before me I think it could not be seriously contended that, had powers of revocation been omitted from the conveyances made by Clifton, this fact would have been entitled to much, if any, consideration, in a suit brought by him to annul the settlements. To such a suit the chancellor might have said, as Chancellor Hatherly did in Phillips v. Mullings: "You were an exceedingly indiscreet and improvident young man. You made the settlements to guard against your own folly and extravagance. Of what advantage would it have been to place the money in this way, out of your control, and then give you power to destroy the limitations whenever you pleased."

But, whatever may be the true doctrine, all of the foregoing cases, and many more that might be cited, certainly do establish that it is ordinarily proper to insert a power of revocation in a voluntary settlement; nay, more, that the omission of such a power will subject the settlement to more or less suspicion. Certainly the practice in England for centuries has been to insert such a power in family settlements.

A practice which is thus approved by time, and which has received the sanction and encomium of courts of equity in both England and America, cannot be regarded as vicious or immoral. Should I hold that these settlements of Clifton are fraudulent and void as to his subsequent creditors simply because they contain powers of revocation, I should overturn an ancient practice and a long line of decisions; nay, I should hold that courts of equity have themselves advised frauds to be committed.

The fact that Clifton inserted powers of revocation in his settlements, so far from proving that he contemplated defrauding his future creditors, tends to show the contrary. Should he simply revoke the settlements, then, of course, the property conveyed would revert to him, and be liable at law for all his debts. And should he exercise the power of appointment for even the benefit of a stranger, then, according to an unbroken current of authority, the whole estate appointed would be liable in equity to his debts. Thompson v. Towne, 2 Vern. 319; In re Davies' Trusts, L. R. 13 Eq. 163; Williams v. Lomas, 16 Beav. 1; Petre v. Petre, 14 Beav. 197. If, then, he had meditated a fraud he would have omitted the power altogether. He would have relied altogether on the affection and beneficence of his wife to provide for him. To contend that he intended to defraud his creditors, and at the same time to exercise the power of revocation arbitrarily, is to maintain a contradiction, since, as we have seen, the exercise of the power would, ipso facto, render the property liable in equity for his debts, unless, indeed, we can assume that he was gifted with a foresight which none of the facts warrant. A man, it is true, might make a voluntary settlement on his wife, and, contemplating

that he might be adjudged a bankrupt in the future and be discharged from his debts, reserve a power of revocation for the very purpose of reinvesting himself in such contingency with the property, relying upon holding it free from debts contracted before bankruptcy. It is by no means certain that such a reliance would be safe. It is by no means certain that such a device would not be pronounced a fraud on the bankruptcy act. But assuming that it would not be fraudulent, there is nothing in the present case to suggest that the grantor had any such forethought or was actuated by any such motive. At the time of the settlements he was not only free from debt, but possessed of a large estate. He was not engaged in trade, and all the testimony shows that nothing was farther from his contemplation than bankruptcy. That he did in fact become bankrupt in the short space of two years is partly explained by the large shrinkage in the value of real property, and the decrease in its rents, but it is best accounted for by his frank confession that he has squandered much in reckless dissipation and gaming.

I do not mean to intimate that Clifton, having regard to the motive and circumstances which prompted these settlements, should not have reserved a power of revocation. Had he known his own habits as well as his acquaintances knew them, and had his motive been solely to guard against his follies, it would have been more consistent with that motive to deprive himself of all dominion over the estate settled. But he could not know himself as others knew him, and he doubtless had implicit faith that, even should misfortune overtake him, his affection for his wife would be a sufficient guaranty that he could not be persuaded to strip her of his bounty.

The settlements being of his own pure bounty, he might well wish to reserve to himself power to modify the limitations of them according to the future necessities and exigencies of his family. Then, too, the grantor has given reasonable explanation of the particular reservations contained in these deeds. He says that, at the time they were made, he contemplated removing to California, and that his object in reserving the powers of revocation was that he might change the investments from Kentucky to California. He did not expect to exercise the powers for his own benefit; he did not know that he could do so. He only contemplated settlements in California to the same uses declared in the original conveyances.

This suggestion derives additional force from the uncertainty in which the law of Kentucky stood at the time the conveyances were made in respect to the power of a married woman over her separate estate. The Revised Statutes adopted in 1852 had, in effect, destroyed separate estates. They had, in effect, provided that where real or personal property should be conveyed or devised to the separate use of a married woman she should not alienate the same by joining her husband in an ordinary conveyance or in the exercise of a power, except when the estate was a gift, and then it might be conveyed by the consent of the donor, or his personal representative.

This provision was so anomalous that it gave much perplexity to the legal profession and produced much litigation. It was frequently amended, but, even down to the date of the settlements in question, its precise meaning and operation were not determined. So uncertain was its construction that timid lawyers might have been found who would not have advised the acceptance of a conveyance from husband and wife of an estate conveyed by the husband to the separate use of the wife. At any rate, Clifton might well have thought it best to guard against the uncertainty by reserving to himself a power which would avoid all difficulty.

Every grantor in England has, by virtue of the second section of the statute of 27 Elizabeth, the substantial right to revoke and annul his voluntary conveyance, since such conveyance is declared by said statute to be fraudulent as to subsequent purchasers for value, with or without notice. Dolphin v. Aylward, L. R. 4 H. L. 486; Rob. Conv. 39–41. A grantor may, therefore, revoke or annul his voluntary conveyance at any time by conveying the property included in such conveyance to a purchaser for value. But the statute is limited in its remedial operation to purchasers, and, consequently, such settlements cannot be defeated by subsequent creditors. Dolphin v. Aylward, supra. So, also, the fifth section of the same statute, which makes all conveyances containing powers of revocation fraudulent and void as to subsequent purchasers, does not extend to creditors. Voluntary settlements, whether they do or do not contain powers of revocation, cannot be assailed by creditors unless they are fraudulent. They are revocable by the grantor either by virtue of the express power reserved or by virtue of a subsequent conveyance for value, but it has never been held that they are on this account fraudulent as to creditors.

But, say complainant's counsel, Mrs. Clifton's title is but the "ghost of a title;" that the legal title is or was in her husband, who reserved to himself absolute power to revoke or to appoint to new uses, and that, therefore, it is not such a title as a court of equity will uphold.

I know it is sometimes said that a court of equity will not enforce every deed made by a husband to his wife. Bish. Mar. Wom. § 717. The cases usually cited to support this view are Beard v. Beard, 3 Atk. 71; Moyse v. Gyles, 2 Vern. 385; Stoit v. Ayloff, 1 Ch. R. 33. Of all these cases it may be said that they were decided at a time when the rights of married women were not so

fully acknowledged or so zealously protected by courts of equity as they are at the present day. It is also to be observed that in the first case the gift was so extravagant as to excite just suspicion of fraud and undue influence. In the second the court refused to aid the defective grant on the ground that it was without consideration. In the third the contract was executory. None of these cases would at all impeach a grant containing no more than a fair provision for the wife, and if they would, they are opposed to the cases heretofore cited in this opinion, to the well-settled doctrine of the supreme court of the United States, and to the whole current of later authority.

When the settlement is made by a husband, free from debt, when it is induced by no fraudulent motive, when it makes no more than a reasonable provision for the wife, when it confers any benefit on her, I can conceive of no reason why a court of equity should decline to uphold it. Though the grant may not contain every provision which a chancellor would direct to be inserted in a settlement ordered by himself, though it contains reservations tending to impair the full benefit of the provision made for the wife, yet if the grant confers any substantial benefit on the woman, so long as she is in the actual enjoyment of that benefit, a court of equity should and will protect her.

Again, complainant's counsel, whilst they admit that a husband may, by direct conveyance to his wife, make a provision for her which will be enforced in equity; whilst they substantially admit that the provision made by Clifton for his wife was reasonable; whilst they admit that the grants made by him are not void, simply because of the powers reserved in them, yet they somehow insist that all these things combined vitiate the deeds. Their contention is that, as the legal title remained in the husband, notwithstanding the alleged conveyances, and that as this legal title is coupled with absolute dominion over the property, as a legal consequence of the reserved powers, the whole right and property remained in the husband, and passed on his bankruptcy to his assignee. But if, as we have seen, the husband may make a conveyance to his wife which will be upheld in equity; if, as we have also seen, the reservation of a power of revocation or of new appointment does not render such settlement void, it is impossible to conceive that the union of the two particulars in the same instrument would destroy it. It is inconceivable that the mere union of two objections, each of which is a phantom, can render the compound substantial.

It must not be overlooked that complainant himself has appealed to a court of equity. In this court Mrs. Clifton's title is as complete as if she had been a feme sole when the conveyances were made to her. The husband's right and interest are not recognized in this court. Every argument, therefore, which is founded on the notion that any substantial title or interest remains in him can have no force in this forum.

The last proposition of complainant's counsel is that by operation of the bankruptcy act the property embraced in these settlements, or at least the powers therein reserved, which might be exercised by the grantor for his own benefit, passed to his assignee in bankruptcy.

We have seen that the title which the bankrupt at the time of his bankruptcy held in the property claimed was held in trust for his wife. Now, by the express terms of the statute, property so held does not pass to the assignee in bankruptcy. Section 5053 of the Revised Statutes provides that "no property held in trust by the bankrupt shall pass by the assignment."

To ascertain what property does pass to the assignee in bankruptcy, reference must be had to sections 5044 and 5046. The first of these sections provides that "as soon as the assignee shall be appointed and qualified, the judge or * * * register shall * * * assign and convey to the assignee all the estate, real and personal, of the bankrupt, with all his deeds, books and papers relating thereto, and such assignment shall relate back to the commencement of the proceedings in bankruptcy, and by operation of law shall vest the title to all such property and estate, both real and personal, in the assignee." The second provides that "all property conveyed by the bankrupt in fraud of his creditors, all rights in equity, choses in action, patent rights and copyrights, all debts due him, or any person for his use, and all liens and securities therefor, and all his rights of action for property or estate, real or personal, and for any cause of action which he had against any person arising from contract or from the unlawful taking or detention or injury to the property of the bankrupt; and all his rights of redeeming such property or estate, together with the right, title, power and authority to use, manage, dispose of, sue for, and recover or defend the same, as the bankrupt might have had if no assignment had been made, shall, in virtue of the adjudication of bankruptcy and the appointment of his assignee, * * * be at once vested in such assignee."

It will be perceived that powers of revocation and powers of appointment, though they be such as may be exercised by the bankrupt for his own benefit, are not enumerated among the things which pass to the assignee either by virtue of the assignment or of the adjudication in bankruptcy. The "power" which is enumerated and does pass, is only the power to sell, manage, dispose of, sue for and recover, or defend the property and rights which do pass.

A power is not property or an estate. A power to convey or appoint property may be lodged in one having no interest whatever in the property over which the power is to be

exercised, or in one having an estate or interest in it. But in either case the power is distinct from the estate. It may be that a grant of property to A., to dispose of it as he should please, would invest him with a complete title; but ,a grant to A. for life, with remainder to such persons as he should by deed or will appoint, will not give him the absolute interest, although he might acquire it by the exercise of the power. 1 Sugd. Powers, 120; Maundrell v. Maundrell, 10 Ves. 246; Reid v. Shergold, Id. 371; Burleigh v. Clough, 52 N. H. 272; Collins v. Carlisle's Heirs, 7 B. Mon. 13; McGaughey's Adm'r v. Henry, 15 B. Mon. 383. So a conveyance by A. to B. and his heirs in trust for A. for life, remainder to such persons or uses as A. should appoint, and in default of appointment in trust for C. and his heirs, would leave or vest in A. a life estate only. Or, if A. should convey to B. in trust for himself for life, reserving to himself an absolute power of revocation, still A. would have only a life estate in the property limited. The power of revocation reserved would neither render the conveyance void nor have the effect of enlarging his estate. The learned judges who decided the case of Willard v. Ware, 10 Allen, 263, certainly so understood the rule, else they need not have troubled themselves with the perplexing question presented in that case, whether the power of appointment reserved in the deed, which was there the subject of consideration, had been actually exercised.

The bankruptcy statute of 13 Eliz. "enables the commissioners to dispose of any estate for such use, right or title as such offender (bankrupt) then shall have in the same which he may lawfully depart withal." And the statute of 21 James I. directs bankrupt laws to be expounded most favorably for the relief of creditors. I quite agree with Sir Edward Sugden when he says that "as a power is a mere right" to declare the trust of an estate upon which declaration the statute of uses immediately operates, and, as it is therefore clearly a use, interest or right which the bankrupt "may lawfully depart withal," there is considerable ground to contend that the bargain and sale of the commissioner should have the same operation as the execution of the power by the bankrupt whilst solvent would have had; but such was never in fact the construction of these statutes. In Lord Townshend v. Windham, 2 Ves. Sr. 3, and in Thorpe v. Goodall, 17 Ves. 388. Lord King is said to have held that in the case of a tenant for life, with power to charge £100, the power was not such an interest as would pass to the assignees.

Holmes v. Coghill, 7 Ves. 498, was thus: Sir John Coghill, under a settlement made by himself in 1757, reserved the power to himself to charge the estate, situate in certain counties, with any sum not exceeding £2.000. Sir John was also entitled to other estates, remainder in tail to his oldest son.

The son arrived of age in 1787, and thereafter he and the father suffered a recovery, and then made a settlement. This settlement embraced all or some of the property mentioned in the settlement of 1757. It not only expressly extinguished the power reserved in the settlement of 1757, but directed the trustees to raise such sum, not exceeding £2,000, as Sir John should direct, and pay the same to him or his assigns; or, if the same should not be raised and paid over in his lifetime, then upon trust to raise the same at such time and pay the same to such person as Sir John should appoint. By his will, dated in 1775, and therefore before this settlement, Sir John gave the sum of £2,000, to be raised under the power, to be applied to the payment of his debts. There was a codicil to this will which bore date subsequent to the settlement of 1787, but it took no notice of this power. The bill was filed by creditors. Held, by the master of the rolls, Sir Wm. Grant—First: That the power reserved in the original deed of 1757 was discharged by the deed of 1787. Second: The will refers only to the power reserved in the deed of 1757, and consequently it is no execution of the power reserved in the deed of 1787. Third: There is an evident difference between a power and an absolute right of property. Fourth: Equity will aid the defective execution of a power, but it cannot itself execute a power. The case was affirmed on appeal. 12 Ves. 206. On the appeal it was urged that there is a difference between an estate to be created under a power which must be limited to a third person and one which may be limited to the donor himself. It was conceded that in the first case the power must be asserted. but in the latter it was strongly insisted that, as the donor had the same power over the estate which he had over his own estate, it should, in equity at least, be equally subject to his debts. But the court rejected the distinction, remarking: "If the argument in support of this appeal prevails,·there must be an end of the distinction between the non-execution and the defective execution of a power."

In Thorpe v. Goodall, 17 Ves. 388, 460, one who had been adjudged a bankrupt was seized for life of a certain estate, with a general power of appointment, with remainder in default of appointment to the heirs of his body. The suit was by his assignee to compel him to execute the power. Held, by Lord Eldon that equity cannot compel the execution of the power. The learned chancellor, it is true, says that the question whether the power passed, by operation of law, to the assignee was not before him, but he refers to the opinion imputed to Lord King in such terms as to show that he approves it. Sir Edward Sugden says, in his work on Powers (volume 1, p. 225), that upon a bill filed by the assignees against the purchaser in this same case, the vice chancellor was of opinion

that the power did not pass to the assignee. He cites Thorp v. Frere, N. C., M. T. 1819, but I have not been able to find the case reported.

These decisions doubtless led to the enactment of 6 Geo. IV. cc. 16, 5, 77. This statute provides that "all powers vested in any bankrupt, which may be legally executed for his own benefit (except the right of nomination to any vacant ecclesiastical benefice,) may be executed by the assignees for the benefit of creditors in such manner as the bankrupt might have executed the same." A provision substantially the same has, I believe, been incorporated into every bankrupt act which has been passed in England since the date of the above statute, but no similar provision is to be found in our statute, and I must conclude that it was omitted ex industria. It certainly cannot be inferred that the draftsman of our statute was unfamiliar with this provision. It may be found in both of the English bankrupt acts of 1861 and 1869. And we know that many of the provisions in our original and amended acts were copied from these statutes.

But whether it was omitted intentionally or not may not be material. Our statute certainly contains no such provision, and it is impossible to construe it as passing to the assignee anything which the English statutes enacted prior to 6 Geo. IV. were held not to pass.

As the power reserved by the son in his settlements might be exercised for his own benefit, it is clear that if he was a bankrupt in England his assignee, in virtue of the recent statutes there, might exercise the power for the benefit of his creditors; but as we have no such statute here; as a power is neither real nor personal property, nor an estate of any kind, it is equally clear that this power did not pass to his assignee.

I have no doubt that, in respect to the property which does pass under our statute to the assignee. all the power and dominion which the bankrupt had over it before his bankruptcy likewise passes. Nor have I any doubt that the bankrupt, in virtue of the general provisions of the statute, as well as in virtue of the express terms of section 5050, may be required to execute any instruments, deeds and writings which may be proper to enable the assignee to possess himself fully of the assets; but it is only in respect to the assets of the bankrupt which have passed to the assignee that he can be required to execute any instruments, deeds or writings. He cannot be required to execute a mere power, since a power is not assets or property, or embraced among the things and rights which the statute declares shall pass to the assignee.

But. complainant's counsel insist that the justices of the supreme court have given construction to our statute to the effect that it does embrace powers to dispose of or charge property. In proof of this they refer to schedule B, which forms part of every bankrupt's petition, and which schedule was prescribed by the justices under authority of law (section 4490).

It is true that the caption of schedule B implies that the petitioner shall include therein "property in reversion, remainder or expectancy, including property held in trust for the petitioner, or subject to any power or right to dispose of or charge." It is also true that the directions in the body of that schedule seem to contemplate that the petitioner shall mention all "rights and powers wherein I (he,) or any other person or persons in trust for me (him,) or for my (his) benefit have any power to dispose of, charge or exercise."

No one more readily than I would submit to a decision of the supreme court; but I cannot regard this schedule, though nominally prescribed by its justices, as a decision of the court. The judges cannot in this way give an authoritative construction to the statutes. Besides, the schedule does not purport to be a construction of the statute. nor does it necessarily imply that all the rights enumerated in it will pass to the assignee in bankruptcy. It is true it would seem idle to insert in the schedule anything in which the assignee could have no interest, but the petitioner cannot be allowed to judge whether or not a given right or interest will pass to his assignee, and to include or exclude it from his schedule at pleasure. His assignee should be fully informed respecting his estate. He is entitled to have, and should have, all the information which the bankrupt himself has.

This may suggest some explanation of the requisitions contemplated by the form prescribed in the schedule. Certainly the form, in terms, contemplates that the schedule shall include a mere naked power to dispose of or charge property in which the bankrupt never had any interest, and which he could not dispose of or charge for his own benefit. Surely no one would be so bold as to contend that such a power passes in bankruptcy: yet. in my opinion. in view of the decisions in England before referred to, construing bankruptcy acts containing more comprehensive terms than ours; in view of the legislation there declaring that powers which a bankrupt may exercise for his own benefit shall pass to his assignee in bankruptcy, in view of the terms of our statute and its omissions, there is scarcely more ground for the contention that a power which may be exercised by the donee for his own benefit passes to the assignee, either in virtue of the assignment to him or of the adjudication in bankruptcy, than a power which must be exercised by the donee for the benefit of a stranger.

Let an order be entered dismissing the bill with costs.